

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| In Re:<br><br>Solicitud para aumentar el número de jueces en el Tribunal Supremo | 2010 TSPR 214<br><br>180 DPR \_\_\_\_ |

Número del Caso: RE-2010-01

Fecha: 5 de noviembre de 2010

Este documento constituye un documento oficial del  Tribunal Supremo que está sujeto a los cambios y correcciones del pr  oceso de compilación y publicación oficial de las decisiones   del Tribunal. Su distribución electrónica se hace como un servici  o público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In Re:

| | |
|---|---|
| Solicitud para aumentar el número de jueces en el Tribunal Supremo | RE-2010-01 |

RESOLUCIÓN

En San Juan, Puerto Rico, a 5 de noviembre de 2010.

Conforme a la autoridad que nos concede el Art. V, Secs. 3 y 4 de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Titulo 1 se solicita a la Asamblea Legislativa que mediante legislación, se aumente a nueve el número de jueces que componen el Tribunal Supremo.

Esta petición responde a dos factores de gran peso: Primero, se pretende asegurar que el Tribunal tenga los recursos humanos necesarios para agilizar su calendario y mantener al día el trámite de los casos que se le presentan. Segundo, se busca que el Tribunal tenga la composición adecuada para modificar su funcionamiento, de modo que pueda operar de una forma más transparente y accesible al Pueblo. La celebración de un número mayor de vistas orales así como la solución ágil y rápida de los recursos ante nuestra consideración requieren un cambio en el número de integrantes de este Tribunal.

La Constitución de Puerto Rico dispone, en su Art. V, Sec. 3, que

> [e]l Tribunal Supremo será el tribunal de última instancia en Puerto Rico y se compondrá de un juez presidente y cuatro jueces asociados. El número de sus jueces sólo podrá ser variado por ley, a solicitud del propio Tribunal Supremo.

Lo mismo se recoge en el Art. 3.001 de la Ley Núm. 201 de 22 de agosto de 2003, conocida como la Ley de la Judicatura de 2003, 4 L.P.R.A. sec. 24r. Este lenguaje nos reconoce la facultad de solicitar a la Asamblea Legislativa que varíe por ley la composición de los jueces de este Tribunal. Esta disposición de la Constitución fue propuesta por este Tribunal y debatida extensamente en la Convención Constituyente de Puerto Rico. Al respecto, el delegado, Sr. Ernesto Ramos Antonini, se hizo eco de la posición institucional de este Tribunal sobre ese precepto constitucional:

> 'A estos efectos, en relación con este segundo punto, deseamos informar que si la Convención considera que debe proveerse en la constitución en cuanto a una variación en el número de jueces, sería deseable que dicha variación se hiciera solamente a petición del propio tribunal'. Esas son las palabras del Tribunal Supremo, a través de su presidente.
>
> 1 <u>Diario de Sesiones de la Convención Constituyente de Puerto Rico</u>, pág. 524 (1961).[1]

Finalmente, la Constitución de Puerto Rico dispuso para que esa variación en la cantidad de jueces se hiciera a petición del Tribunal Supremo. Según el delegado, señor Ramos Antonini, la Convención Constituyente acogió ese mecanismo ya que fue parte del programa aprobado por el pueblo de Puerto Rico. Diario de Sesiones, <u>id.</u>, págs. 540 y 552. "[E]sa es una fórmula muy sabia, muy buena, porque tampoco es indigna para el tribunal...". Expresiones del delegado, Sr. Luis A. Ferré, Diario de Sesiones, <u>id.</u>, pág. 543.

---

[1] De hecho, la Escuela de Administración Pública de la Universidad de Puerto Rico hizo pública su oposición al mecanismo que se establece en el Art. V, Sec. 3 de nuestra Constitución. Universidad de Puerto Rico, Escuela de Administración Pública, <u>La nueva constitución de Puerto Rico: Informes a la Convención Constituyente</u>, Madrid, Ediciones de la U.P.R., 1954, págs. 465-466. No obstante, la Asamblea Constituyente descartó su análisis e incluyó el texto del Art. V, Sec. 3, a petición nuestra.

Este método le permite al Tribunal ajustar sus recursos según lo requieran sus necesidades. El proceso para aumentar el número de jueces se origina en el propio Tribunal. El delegado Ramos Antonini expresó que esa cláusula asegura que "el poder judicial no pu[eda] ser 'empaquetado' en ningún momento de su historia por razones políticas, o beneficios de cualquiera otra clase, que pu[eda] poner en peligro las garantías consignadas en la propia constitución". Diario de Sesiones, id., pág. 552.

La experiencia demuestra la sabiduría de los padres de la Constitución. Este Tribunal no ha vacilado en recurrir al mecanismo constitucional cuando la tarea judicial ha requerido que se aumente o se reduzca el número de jueces que lo componen. Asimismo, la Asamblea Legislativa ha mostrado invariablemente su deferencia a los pedidos de este Tribunal al amparo del Art. III, Sec. 3 de la Constitución.

Por su parte, el Art. V, Sec. 4, de la Constitución dispone que "[e]l Tribunal Supremo funcionará, bajo las reglas de su propia adopción, en pleno o dividido en salas compuestas por no menos de tres jueces". Al respecto, nuestro Reglamento recoge las normas que regulan la toma de decisiones de este Tribunal. El término "decisión" incluye "cualquier sentencia, resolución, orden, providencia o cualquier otra actuación del tribunal...". Regla 3 del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. XXI-A. Las decisiones de este Tribunal en pleno –una de las cuales es esta Resolución– se adoptan por la mayoría de los jueces que intervienen. Regla 4(a), 4 L.P.R.A. Ap. XXI-A.

La única excepción a esa regla de mayoría simple está establecida por la propia Constitución. Ésta es, "[n]inguna ley se declarará inconstitucional a no ser por una mayoría del número total de los jueces de que esté compuesto el tribunal". Constitución de Puerto Rico, Art. V, sec. 4. Véase la Regla 4(a) de nuestro Reglamento, supra. En otras palabras, aunque al emitir nuestros dictámenes siempre nos esforzamos para obtener la conformidad del mayor número de nuestros integrantes, ni siquiera al ejercer nuestra función como intérpretes máximos de la Constitución se requiere unanimidad de criterio. No se requiere unanimidad porque hacerlo conferiría un poder de veto a cada uno de los jueces. Eso frustraría el consenso mayoritario y paralizaría el Tribunal, en perjuicio de nuestro Pueblo. "Unanimity is impossible; the rule of the minority, as a permanent arrangement, is wholly inadmissible; so that, rejecting the majority principle, anarchy or despotism in some form is all that is left." Adams v. Ft. Madison Community School Dist., 182 N.W. 2d 132, 135-136 (S. Ct. Iowa 1970). "Porque demasiado se sabe que la mayoría de mitad más uno,

es mayoría en un tribunal". Diario de Sesiones, <u>supra</u>, pág. 568 (Delegado señor García Méndez).

En el pasado, este Tribunal ha utilizado en tres ocasiones el mecanismo de resolución para solicitar la variación en su composición. El mismo año de la aprobación de la Constitución de Puerto Rico, este Tribunal solicitó el aumento de la cantidad de sus jueces. La Ley Núm. 2 de 4 de agosto de 1952, aumentó la composición de cinco a siete jueces. Esta acción se fundamentó en el aumento poblacional y de asuntos ante el Tribunal. Para entonces, la población de Puerto Rico había aumentado aproximadamente de 900,000 a 2,500,000. Exposición de Motivos de la Ley Núm. 2, <u>supra</u>.

Sin embargo, este aumento a siete jueces "no fué suficiente para impedir el desarrollo del problema de congestión y demora". Comité para el Estudio y la Evaluación del Sistema Judicial, <u>Informe al Tribunal Supremo de Puerto Rico</u>, Abril de 1965, Parte I, pág. 1.

La Ley Núm. 7 de 6 de mayo de 1961 varió nuevamente la cantidad de jueces de este Tribunal. En aquella ocasión se aumentó de siete a nueve jueces. Esta composición de nueve jueces fue solicitada por este Tribunal para viabilizar la enmienda constitucional de 1960. Esta enmienda permitió al Tribunal funcionar en salas. Informes de las Comisiones de lo Jurídico Civil del Senado y de la Cámara de Representantes sobre el P. del S. 24, pág. 3. Hicimos esa solicitud debido a "la congestión existente en el calendario del Tribunal". <u>Id</u>.

Al así actuar, justificamos en nuestra Resolución la necesidad de un Tribunal Supremo con más jueces para atender los asuntos litigiosos ante nuestra consideración. <u>Id</u>. Esta realidad ameritó el aumento de siete a nueve jueces. Véanse, además, Exposición de Motivos de la Ley Núm. 7, <u>supra</u>; Diario de Sesiones de la Asamblea Legislativa, Cámara de Representantes, Primera Sesión Ordinaria, 14 de febrero de 1961, T. 14, págs. 197-198.

Con una curia de nueve jueces el problema de congestión de casos en el Tribunal Supremo se desvaneció para el año 1975. El 19 de febrero de 1975, emitimos una Resolución en la que notificamos la reducción de los casos pendientes a solamente 145 asuntos. Exposición de Motivos de la Ley Núm. 29 de 28 de mayo de 1975. En esa Resolución expresamos que "el Tribunal Supremo ha logrado reducir en tal modo su calendario que a 31 de enero de 1975 el número de casos criminales pendientes a su consideración montaba a 16 y el de casos civiles a 129". Resolución del Tribunal Supremo de 19 de febrero de 1975.

Ante esto, solicitamos la reducción de nueve a siete jueces. Esto es, con nueve jueces este Tribunal redujo los

casos pendientes de tal modo que ameritó la utilización de la cláusula constitucional para disminuir la cantidad de jueces a siete. En aquella ocasión entendimos que podíamos afrontar con siete jueces el aumento de los asuntos ante nuestra consideración y la congestión de casos. La razón para esto último fue que "el Tribunal Supremo ha[bía] descongestionado su calendario en tal forma que [era] completamente innecesario tener un Tribunal compuesto por nueve miembros". Informes de las Comisiones de lo Jurídico Civil del Senado y de la Cámara de Representantes sobre el P. del S. 1143, pág. 1.

De la trayectoria de variaciones en la composición de este Tribunal se puede apreciar que la Constitución de Puerto Rico adoptó un mecanismo eficaz para asegurar el funcionamiento óptimo del Tribunal. En el pasado, nuestro sistema judicial se ha valido de ese mecanismo para atender las necesidades que surgen de tiempo en tiempo. Como vimos, ante una congestión en los casos pendientes ante esta curia, aumentamos en 1952 y 1961 el número de jueces que componen este Tribunal.

El último aumento que elevó el número de jueces a nueve logró reducir el atascamiento de asuntos que operaba en detrimento de la justicia. Los datos numéricos así lo reflejan incuestionablemente. Ante ese cuadro fáctico, ya para 1975 el problema que atravesaba este Tribunal se había eliminado. Resuelto ese inconveniente, solicitamos entonces la reducción a siete jueces. Precisamente, esa fue la virtud vislumbrada por nuestra Convención Constituyente. La Constitución nos dota de un método efectivo que nos permite ajustar nuestra composición según lo requieran las necesidades del Pueblo.

Sin embargo, la realidad hoy es muy distinta de aquella que nos impulsó en 1975 a solicitar la reducción a siete jueces. Debemos dirigir nuestras acciones considerando la importancia de nuestra función como máximo foro judicial de Puerto Rico. Los ciudadanos acuden a este Tribunal para defender, vindicar y reclamar sus derechos. Esta tarea es sin dudas una de las más importantes que ejerce el Gobierno y no podemos tomarla con ligereza. Una vez más, nos hacemos eco del planteamiento de que "una justicia tardía... no es la justicia ideal". In re Reforma Judicial, 136 D.P.R. 1, 54 (1994), Voto particular de la entonces Juez Asociada señora Naveira de Rodón, al cual se unieron el Juez Presidente señor Andréu García y los Jueces Asociados señores Hernández Denton, Alonso Alonso y Fuster Berlingeri. Como señaló el otrora Juez Presidente señor Trías Monge, "[q]ueremos no sólo justicia eficaz, sino justicia pronta". D.M. Helfeld, El seminario sobre la demora judicial: Diseño, resultados y recomendaciones, 77 Rev. Jur. U.P.R. 891, 893 (2008). Por su parte, el Juez Presidente señor Hernández Denton también ha expresado que "[j]usticia lenta no es justicia". Id.

Por eso, es necesario hacer un recuento histórico de hechos y estadísticas que hacen evidente la demora judicial inaceptable por la que atraviesa este Tribunal. Para comienzos del año fiscal 1996-97, este Tribunal Supremo contaba con siete jueces y con 546 casos pendientes ante su consideración. Los casos pendientes son los asuntos no resueltos y que se arrastran de años anteriores. Esa cifra incluye los casos sometidos y en espera de resolución por el Tribunal, así como aquellos que están en trámites de perfeccionamiento. A su vez, los que están en trámite de perfeccionamiento incluyen los recursos y asuntos que no han sido atendidos por el pleno del Tribunal y los que están en espera de ser completados.

Durante ese año fiscal, se sumaron 722 casos nuevos, lo que dejó al Tribunal con un volumen total de 1,268 asuntos en espera de nuestro dictamen. No obstante, a pesar de que este número era el volumen total más bajo desde el 1980-81, fue imposible atender efectivamente la congestión de asuntos ante nuestra consideración. De ese total de asuntos ante el Tribunal se pudieron resolver 814 casos, "lo que represent[ó] un índice de congestión de 35.80% y una reducción de 3.94%...". A. Pérez López, Sumario: Análisis estadístico, 65 Rev. Jur. U.P.R. 685, 687 (1998). De esos 454 casos pendientes que no pudimos atender, había 165 asuntos sometidos y 289 en trámite de perfeccionamiento. Id.

Al 30 de junio de 1974, había 629 casos pendientes ante este Foro. Nota, Análisis del trabajo del Tribunal Supremo en el término de 1974-1975, 45 Rev. Jur. U.P.R. 129, 133 (1976). Como mencionamos en nuestra Resolución de 19 de febrero de 1975, cuando solicitamos disminuir la composición del Tribunal de nueve a siete jueces, habíamos reducido la cantidad de casos pendientes a 145. Sin embargo, al 30 de junio de 1975 el número de casos pendientes aumentó a 369. Id. Desde entonces hemos tomado medidas para atajar la demora judicial en nuestros tribunales. C.J. Sagardía Abreu, Consideraciones generales sobre la demora judicial en el Tribunal de Primera Instancia, 77 Rev. Jur. 961, 970 (2008).

Las medidas implementadas no incluyeron el aumento en la composición del Tribunal Supremo. Ya para 1996 el número de casos pendientes en este Tribunal había aumentado a 546. Esto representó un aumento de casi un 400% de los casos pendientes en comparación con 1975. Posteriormente, esta situación empeoró con el pasar del tiempo al punto que esta cifra ascendió en el año fiscal 2008-09 a 730 casos pendientes y a 792 para el año fiscal 2009-10. Ese aumento fue casi un 500% del volumen de casos pendientes, en comparación con 1975, cuando solicitamos la reducción del número de jueces de este Tribunal.

¿Cómo llegamos a esa situación? El año fiscal 1999-2000 inició con un volumen de 487 casos pendientes. Si a ese número le sumamos los casos presentados y los reabiertos durante ese año fiscal resulta que este Tribunal tuvo ante su consideración 1,747 asuntos. Esta cifra representó un aumento de 1.8% en relación con el año fiscal 1998-99. Además, este número es notablemente mayor al volumen total de asuntos en espera de nuestro dictamen para el año fiscal 1996-97. Para entonces, este Tribunal logró resolver en ese término 1,310 casos, lo que representa "un índice de acumulación o congestión de 25%". J.R. Rodríguez Martínez, Análisis estadístico, 70 Rev. Jur. U.P.R. 237, 239 (2001). Al finalizar ese año fiscal, el Tribunal contaba con 437 casos pendientes, de los cuales 112 estaban sometidos y 325 en trámite de perfeccionamiento. Id. Es menester considerar que la cantidad de casos en trámite de perfeccionamiento incluyen los asuntos que este Tribunal no había podido considerar en la etapa de expedición.

Para el año fiscal 2000-01, este Tribunal tuvo 1,575 asuntos ante su consideración. Esta cantidad fue significativamente inferior al año fiscal anterior. Sin embargo, al final del año fiscal la cantidad de casos sometidos y no resueltos por el Tribunal aumentaron a 174. Esto representó un aumento de 2.4% en el índice de acumulación o congestión, ya que esta cifra ascendió a 27.4%. J. Gleason Altieri y C.R. Pastrana Torres, Análisis del término 2000-01 del Tribunal Supremo de Puerto Rico: Análisis Estadístico, 71 Rev. Jur. U.P.R. 205 (2002).

Este Tribunal comenzó el año fiscal 2003-04 con un volumen total de 458 casos pendientes y durante ese año se presentaron 1,187 casos nuevos. Durante ese término el volumen total de casos ante nuestra consideración fue de 1,645. En ese año, este Tribunal resolvió 1,218 casos. Al finalizar el año fiscal se dejaron 427 asuntos pendientes, lo que representó un índice de acumulación o congestión de 26%. Aunque esa cifra fue menor al 30.8% del año anterior, una vez más se experimentó un aumento en comparación con las cifras de principios de la década del 2000. Para los datos estadísticos, véanse L.S. Herrero Acevedo, La demora judicial en los foros de última instancia, 77 Rev. Jur. U.P.R. 1055, 1066-1067 (2008); A. Rivera Torres y G. Flaque Durán, Análisis estadístico, 74 Rev. Jur. U.P.R. 3 (2005).

Si tomamos en consideración que en 2002 el índice de congestión era de 23% y que para el 2006 era de 32.1%, debemos concluir que hemos sido incapaces de reducir la demora judicial con un Tribunal Supremo compuesto por siete jueces. En esos cinco años, el índice de congestión osciló entre el 23% y el 32.1%. Id.

Peor aún, la cantidad de casos pendientes al terminar el año fiscal 2008-09 ascendió a 730. Esta cantidad aumentó a 792 al finalizar el año fiscal 2009-10. Esto ocurrió a pesar de que durante el año fiscal 2009-10, distinto a lo ocurrido durante el año fiscal 2008-09, el Tribunal operó todo el año con siete jueces, es decir, a plena capacidad.

En comparación con el año 1975, esto representa un aumento de más de cinco veces en la cantidad de casos pendientes. Esta cantidad de casos pendientes no tiene precedentes en las cifras antes reseñadas. Aunque estas cifras incluyen los casos en trámite de perfeccionamiento no podemos borrar el hecho que muchos de esos casos se encuentran en espera de que este Tribunal decida si va a expedir un auto discrecional o no.[2]

Además, esta cantidad de casos pendientes es similar a la que motivó a este Tribunal a solicitarle a la Asamblea Legislativa en el 1961, un aumento de siete a nueve jueces en el número de su composición. Así, al finalizar el año fiscal 1960-1961, el total de casos pendientes era de 830. Véanse: Comité para el Estudio y la Evaluación del Sistema Judicial, Informe al Tribunal Supremo de Puerto Rico, abril de 1965, Parte I, pág. 3; A. García Padilla y J.J. Álvarez González, El Tribunal Supremo de Puerto Rico: La Corte Pons, 59 Rev. Jur. U.P.R. 185, 222 n. 110 (1990).

El número de 792 casos pendientes al 30 de junio de 2010 incluye no solo los 155 casos sometidos para una opinión o sentencia. La cifra incluye también los 442 casos pendientes para que el Tribunal los considere y decida si va a expedir un auto discrecional, así como los

_____

[2] A lo anterior debemos añadir que la Ley Núm. 161 del 1 de diciembre de 2009, según enmendada, conocida como "Ley para la Reforma del Proceso de Permisos de Puerto Rico", 23 L.P.R.A. sec. 9011 (Sup. 2010), establece que este Tribunal podrá revisar directamente las determinaciones finales que emita la Junta Revisora de Permisos y Uso de Terrenos. Es decir, las partes no tendrán que recurrir al Tribunal de Apelaciones (foro judicial que típicamente revisa las determinaciones finales de las agencias administrativas), sino que podrán acudir directamente ante nos para solicitar la revisión de las resoluciones que emita la Junta Revisora. Este mecanismo es parte del nuevo enfoque de la Ley que busca que el sistema de permisos en Puerto Rico sea uno ágil y eficiente. Véase, Exposición de Motivos de la Ley Núm. 161, id. Es muy probable que con su implantación se presenten más recursos ante este Tribunal. Ello aconseja que tomemos todas las medidas que sean necesarias de cara a esa eventualidad.

195 casos que están en espera de que una parte muestre
causa o presente su alegato.

En la actualidad, este foro tarda aproximadamente
seis meses y medio para tan solo decidir si expide o no un
auto. Esos recursos son importantes y el Tribunal tiene
que invertir gran parte de su tiempo todas las semanas
para atenderlos. Esa tarea es tan importante que tenemos
un Panel Central de oficiales jurídicos que hace un
estudio inicial de todos los casos que se presentan,
incluyendo aquellos que se resuelven declarándolos "no ha
lugar". Véase, A. Negrón García, Práctica apelativa:
Aspectos constitucionales, legales y reglamentarios, 42
Rev. Jur. U.I.P.R. 1, 18-19 (2007). Decidir esos casos
semana tras semana conlleva estudio y preparación.[3] No se
pueden despachar a la ligera ni subestimar su importancia
para las partes o su impacto en nuestra tarea judicial.

---

[3] Como bien lo ilustra el ex Juez Asociado señor Negrón
García:

Los recursos presentados, de carácter discrecional,
pasan a un Panel Central compuesto por un grupo de
abogados que evalúa inicialmente tanto el aspecto
jurisdiccional como los méritos. El director del Panel
asigna los casos a los abogados, quienes estudian los
recursos asignados y los respectivos memorandos,
apéndices y demás anejos...Esos informes o memorandos
son remitidos a los jueces, de manera que ellos cuenten
con el beneficio de una evaluación inicial de los casos
que serán discutidos oportunamente en sesión del Pleno.

Luego el recurso es personal y directamente informado en
la conferencia plenaria por el juez a quien le fue
asignado. Como ponente, éste formula una recomendación
inicial, que puede ser que se deniegue el recurso, se
expida, se emita una orden de mostrar causa, o se adopte
cualquier otro curso de acción o trámite. En dicha etapa
todos los jueces exponen -breve o extensamente- sus
respectivos puntos de vista y criterios jurídicos sobre
los méritos o frivolidad del recurso. En orden a esa
discusión, o en aquellos casos dudosos si es necesario,
se autoriza una Exposición Narrativa de la Prueba o la
Transcripción de Evidencia. También se solicitan los
autos originales, y cuando es menester, se ordena que se
eleve la prueba documental. Si algún magistrado desea
estudiar el recurso más a fondo, se pospone su
consideración para otra conferencia del Pleno. La
divergencia de un solo magistrado es suficiente para
abrir más amplia y detalladamente la discusión. Cada
magistrado expone su posición, y finalmente, por
votación mayoritaria se adopta el acuerdo.

Negrón García, supra, págs. 18-19.

Tan importante para la marcha de la justicia son los casos que ya atendimos como aquellos que llevan meses esperando para que los consideremos. Vale tanto el que ya entró como el que está tocando a la puerta para que le atiendan. Los números demuestran que, definitivamente, el número de jueces disponible para atender estos asuntos incide en la demora judicial.

Esto refleja que las medidas que hemos adoptado para hacerle frente al problema de demora judicial han sido infructuosas hasta el presente. Ni siquiera la creación del Tribunal de Apelaciones ha podido menguar la congestión del calendario de este Tribunal. Cuando se creó el Tribunal de Circuito de Apelaciones en el año fiscal 1993-94, el volumen de casos pendientes ante este Tribunal bajó considerablemente de 1123 casos pendientes al inicio del año fiscal 1992-93 a 592 al inicio del año fiscal 1993-94. Ello se debió a que referimos 536 casos al foro apelativo intermedio. Véase, J.J. Álvarez González, Derecho Constitucional de Puerto Rico y Relaciones Constitucionales con los Estados Unidos, Bogotá-Colombia, Editorial Temis S.A., 2009, pág. 82. No obstante, durante los años subsiguientes el volumen de casos ante este Tribunal nunca se redujo de manera consistente. Id. Por el contrario, tan reciente como en el año fiscal 2009-10 la cifra de casos pendientes ante el Tribunal ascendió a 792. Esto demuestra, indubitadamente, que la creación del Tribunal de Apelaciones no resolvió el problema de congestión que aqueja a este Tribunal.

Desde 1960, se considera que la congestión de casos se debe a que "el número de radicaciones excede apreciablemente el número de casos que se resuelven anualmente". Informe de la Comisión de lo Jurídico de la Cámara de Representantes de 2 de junio de 1960, sobre la R. Conc. de la C. 24, pág. 1. Eso no ha variado. En el año fiscal 2008-09 se presentaron 1,367 asuntos. En ese período, este Tribunal resolvió 1,257 asuntos lo que nos deja un saldo negativo de 110 casos no resueltos, en un solo término de sesiones. Además, para el año fiscal 2008-09 ante el Tribunal se presentaron 1,367 casos y se resolvieron 1,257, mientras que para el año fiscal 2009-10, se presentaron 1,368 casos y se dispuso de 1,328. Esto significa que aunque el último año fiscal el Tribunal resolvió más casos que durante el año fiscal 2008-09, el volumen de recursos no se pudo reducir ni tampoco neutralizar. Lamentablemente ese volumen se abultó aún más aunque el Tribunal fue más productivo. Esto, no cabe duda, agrava el problema de casos pendientes y la demora judicial. La proyección futura con una composición de siete jueces no es favorable. Los datos citados correspondientes al año fiscal 2009-2010, que se anejan a esta Resolución, demuestran que la productividad y laboriosidad de los integrantes de este Tribunal de más reciente nombramiento no puede cuestionarse.

Cabe destacar que según el censo, en 1960 Puerto Rico tenía una población de 2,349,544 habitantes. Véase, Oficina del Censo, Junta de Planificación de Puerto Rico, http://www.censo.gobierno.pr/. En comparación, según el censo de 2000, la población de Puerto Rico ascendió a 3,808,610 personas. Id. Además, según la Oficina del Censo de Estados Unidos, la población estimada de Puerto Rico en 2009 era de 3,967,179 habitantes. Véase, United States Cesus Bureau, http://www.census.gov/. Esto significa que cuando este Tribunal solicitó el aumento de siete a nueve jueces en 1961, la población de Puerto Rico era mucho menor de la actual. El aumento poblacional desde entonces explica el crecimiento de litigios en todos los foros judiciales de Puerto Rico, incluyendo este Tribunal.

Recientemente, el Prof. David M. Helfeld dirigió un estudio exhaustivo sobre la demora judicial en Puerto Rico. Los hallazgos del estudio realizado por el distinguido profesor y por estudiantes de la Escuela de Derecho de la Universidad de Puerto Rico se recogieron en el volumen 77 del año 2008 de la Revista Jurídica de la Universidad de Puerto Rico. D.M. Helfeld, El seminario sobre la demora judicial: Diseño, resultados y recomendaciones, supra. En síntesis, el profesor Helfeld llegó a las siguientes conclusiones: (1) la demora judicial es un problema serio que trasciende a Puerto Rico; (2) para atajar el problema debemos tomar medidas que se ajusten a nuestra cultura jurídica; (3) el mayor problema de la demora judicial en Puerto Rico se encuentra en el Tribunal de Primera Instancia y en el Tribunal Supremo; (4) el cambio en las reglas de procedimiento civil y en las reglas internas de este Tribunal puede aminorar el problema; y (5) se deben emplear todos los esfuerzos y recursos disponibles para atender el problema de la demora judicial. Helfeld, id., pág. 913. En todos los artículos que exponen los hallazgos del estudio, se llega a una conclusión incuestionable: el Tribunal Supremo opera con una demora judicial que imposibilita el ideal de impartir justicia.

Es necesario enfrentarnos al reto de lograr una justicia plena, pero para eso hay que aceptar "la realidad de que una parte significativa del problema judicial puede encontrarse en [este] foro". Id., pág. 900. Las estadísticas reflejan que el Tribunal Supremo federal, que opera con nueve jueces, resuelve alrededor de 96% de los casos el mismo año que los recibe, mientras este Tribunal, integrado por siete jueces resuelve solamente el 76% en promedio. Id.[4] Precisamente, el impacto de la demora

---

[4] Estos promedios utilizan las estadísticas desde el 2002–2006. En ese período, este Tribunal operó con siete (7) jueces.

judicial y de la congestión de asuntos está en esos casos que nos vemos imposibilitados de atender año tras año. Id. Las diferencias en funciones entre el Tribunal Supremo federal y nosotros no justifican "la superioridad en la eficiencia del Tribunal Supremo de los Estados Unidos". Id. "[E]s esencial entender que no habrá solución hasta que [este Tribunal] reconozca su responsabilidad por su aportación al problema". Id., pág. 901.

Sin duda, el retraso de este Tribunal en la tramitación de los casos tiene un efecto directo en los foros inferiores. Muchos de los casos que atienden los foros de menor jerarquía se paralizan en espera de que este Tribunal resuelva un asunto y devuelva el resto de la controversia. "La dilación en la emisión de una decisión judicial, es, pues, contraria al concepto mismo de justicia". F. Hernández Denton, La Administración eficiente de la justicia, 77 Rev. Jur. U.P.R. 915, 917 (2008). Véase, además, Álvarez González, op. cit., pág. 81. Como bien apunta el profesor Álvarez González:

> El efecto de la congestión trasciende las estadísticas. Un tribunal congestionado es, por naturaleza, menos propenso a dar la atención debida a su fundamental función de pautar el derecho. Eso también tiene efectos sistémicos, pues la incertidumbre jurídica promueve la litigación. El tribunal congestionado es, además, más propenso a combatir la congestión mediante la reducción de la tasa de expedición de recursos discrecionales. Id.

Buscarle la solución a ese problema no es imposible si lo enfrentamos con todas las medidas disponibles. Para hacer esa gesta, el Tribunal de Apelaciones es un buen ejemplo a seguir. Ese foro ha sido eficiente en su encomienda y no tiene problemas de demora judicial. Helfeld, supra, pág. 912. La muestra analizada en el estudio reflejó que el Tribunal de Apelaciones resolvía los certiorari en tres meses, las apelaciones y las revisiones administrativas en seis meses y los recursos extraordinarios en dos meses. Id., pág. 899. Iguales resultados ha logrado obtener el Tribunal de Apelaciones federal para el Primer Circuito. Id., pág. 900.

No obstante, nuestra realidad es muy diferente. A manera de ejemplo, el estudio dirigido por el profesor Helfeld consideró el trámite seguido en 117 casos resueltos por este Tribunal. Un total de 95 casos (o el 81%) tardaron más de un año en resolverse y de éstos, 37 (o el 32%) tardaron más de dos años. Id., pág. 903. Según esa muestra, cuando este foro considera los méritos de una controversia, uno de cada tres casos tardará más de dos años en resolverse. Nos parece injusto ese patrón. Incluso, ese intervalo de tiempo es más devastador que el

que nos impulsó a solicitar el aumento a nueve jueces en 1961. "En el período comprendido entre abril de 1956 y marzo de 1957, más de un 27% de las opiniones se emitieron después de haber transcurrido más de un año desde la sumisión del caso...". Comité para el Estudio y la Evaluación del Sistema Judicial, op cit., pág. 2. Esa cifra es considerablemente inferior al 81% que refleja el estudio antes reseñado sobre nuestra situación actual.

A esa lamentable realidad le tenemos que sumar que este Foro tarda seis meses y medio en tan solo decidir si expide o no un auto, mucho más que los cuatro a cinco meses que mencionó nuestro Juez Presidente en el 2008. Hernández Denton, supra, pág. 927. Este atraso antecede el funcionamiento con menos de siete jueces durante los términos judiciales del 2005 al 2009. Ésta es una estadística inaceptable. En el mismo lapso de tiempo o menos, el Tribunal de Apelaciones resuelve un caso en sus méritos. Si bien es cierto que a diferencia del foro intermedio, este Tribunal tiene la función constitucional de sentar precedentes y pautar así el derecho, esa diferencia no justifica una demora tan grande en la solución de recursos. Mucho menos explica la demora de más de seis meses para emitir un "no ha lugar" a la expedición de un auto discrecional, asunto que no requiere pautar el derecho.

Tenemos que ser conscientes de que esa demora judicial tiene un impacto injusto en la vida de los seres humanos adversamente afectados. Helfeld, supra, pág. 903. Para unos la rapidez con que resolvamos puede ser la diferencia entre la solvencia o la ruina económica. Para otros puede ser la diferencia entre la libertad o la reclusión injusta.

La cifra de casos pendientes disminuirá en la medida en que reduzcamos el tiempo que toma decidir si se expide un auto. Evidentemente, si el Tribunal Supremo opera con más jueces estará en posición de atender un mayor número de recursos por reunión en pleno o salas. Véanse las expresiones de la Lcda. Patricia Otón, ex Secretaria del Tribunal Supremo, en Herrero Acevedo, supra, pág. 1061.

Actualmente, cada uno de los siete jueces presenta cinco casos al pleno, para un total de 35 recursos semanales. Con un funcionamiento de tres salas compuesta por tres jueces cada una, sin más, estaríamos en posición de atender 45 recursos semanales entre las tres salas. Además, la calidad en la revisión aumentará ya que cada juez tendrá que examinar un total de 15 recursos en vez de 35. Esto se debe a que cada sala atendería 15 recursos semanales en vez de los 35 que atiende actualmente el pleno. A corto plazo, ya que la carga semanal de cada juez se reducirá considerablemente, sería posible aumentar temporeramente la asignación de casos de cinco a siete por

juez, lo que aumentaría la producción semanal de 35 a 63 recursos. Al tomar esa medida, cada sala atenderá 21 recursos semanales. Esto es, con esa medida temporera estaríamos duplicando la producción semanal de este Tribunal. Eso nos permitiría eliminar en un plazo breve el atraso existente en la consideración de recursos, para expedir o denegar el auto.

La medida que hoy tomamos nos permite también estudiar con detenimiento los recursos y realza la imagen del Tribunal, ya que desarticula la crítica injustificada por lo que algunos consideran una dependencia excesiva en los memorandos que preparan los abogados del Panel Central de este Tribunal. Véase A. García Padilla y J.J. Álvarez González, supra, págs. 201-203.

El problema de la demora en este Tribunal se agrava si consideramos que la espera en muchos casos no termina la controversia entre las partes, pues el asunto se refiere a otro foro. Ese obstáculo de la justicia debe atenderse con sensibilidad y responsabilidad. Una persona que acude al foro judicial a reclamar sus derechos merece justicia oportuna, no a destiempo. Debemos emplear todos los recursos que estén a nuestro alcance para garantizar una justicia pronta. Asumir la posición contraria sería servirse de criterios ajenos a la función judicial para no hacer lo correcto. Este Tribunal no está dispuesto a permitir tal afrenta a la justicia.

La solución no se limita al aumento de jueces sino que tiene que venir acompañada de la utilización de todos los recursos viables. Por ejemplo, ya adoptamos las nuevas Reglas de Evidencia y de Procedimiento Civil. Actualmente, las propuestas Reglas de Procedimiento Penal se encuentran bajo revisión. Por otro lado, debemos revisar detenidamente nuestro Reglamento para fomentar una resolución efectiva de los asuntos ante nuestra consideración. Todos estos mecanismos deben emplearse paralelamente para asegurar a los ciudadanos un foro en el que puedan reclamar sus derechos de forma eficiente.

El aumento de jueces para atajar la demora judicial ha sido parte de nuestra cultura judicial y ha dado resultados en el pasado. Ahora no debe ser la excepción. La Constitución provee este método para que a petición del Tribunal Supremo se ajuste su composición según las necesidades lo requieran. Ante un problema de demora judicial y de ineficiencia en el manejo de los casos, esta solicitud no debe ser la única acción y debemos fortalecer esta medida con otras.

No se trata de añadir dos jueces a este Tribunal para que siga funcionando igual. De nada sirve aferrarnos a la ineficacia. Debemos replantearnos la manera en que este Foro funciona y atiende los casos que los ciudadanos nos

presentan. Por ejemplo, la práctica generalizada es que luego de acoger un recurso, este Tribunal lo resuelve a base del expediente y sin contar con el beneficio de una vista oral. En cambio, en la inmensa mayoría de las jurisdicciones de los Estados Unidos, las vistas orales son parte integral de su funcionamiento. Ello permite al tribunal aclarar y delimitar las alegaciones de las partes. Además, le permite a los jueces puntualizar sus posiciones luego de un estudio detallado del expediente antes de que se asigne el caso al juez o jueza ponente. Más aún, la discusión del caso luego de la vista oral permite que el recurso se asigne al juez que puede lograr un consenso entre los posibles fundamentos para decidir, lo que evita el fraccionamiento del tribunal por la proliferación de opiniones producto de la falta de consenso. Eso realza los beneficios importantes de la colegiación, contribuye a la eficiencia del tribunal y propende a que éste paute el derecho de una forma clara y precisa.

La falta de vistas orales en este Tribunal y de una reunión plenaria luego de cada vista, para votar y asignar el caso para la redacción de la ponencia mayoritaria, ha sido objeto de crítica bien fundamentada. Véanse García Padilla y Álvarez González, id., págs. 197-198; Herrero Acevedo, supra, págs. 1071-1072. Lo cierto es que la celebración de más vistas orales y la discusión posterior de cada caso por el Tribunal en pleno, es parte importante de un funcionamiento transparente y accesible al Pueblo desde un foro verdaderamente colegiado.

> En primer lugar, ello obliga a los jueces a hacer su estudio independiente del caso y de los alegatos de las partes antes de que circule entre ellos un borrador de opinión. De esta forma cada juez se encuentra en mejor posición para evaluar las bondades y defectos del borrador de opinión que eventualmente se prepare, para sugerir modificaciones o para producir una opinión separada con mayor celeridad.

> Segundo, y no menos importante, el método propuesto reduce el potencial de fricciones entre un grupo de personas que vienen llamadas a convivir por un largo número de años. Desde la perspectiva humana, simplemente es más sencillo y genera menos tensión interpersonal asumir una postura en un caso antes de que otro juez haya hecho un estudio más profundo y haya redactado un proyecto de opinión.

> García Padilla y Álvarez González, supra, pág. 197 n. 28.

Como señaló hace décadas el Comité para el Estudio y
Evaluación del Sistema Judicial, Informe al Tribunal
Supremo de Puerto Rico sobre el Tribunal Supremo (abril de
1965), op. cit., pág. 17:

> La experiencia del Tribunal Supremo de los
> Estados Unidos y de varios otros tribunales
> demuestra cuán preferible es que cada caso sea
> objeto de estudio y discusión por cada juez y de
> que la asignación de la tarea de escribir la
> opinión del Tribunal se haga por el Juez
> Presidente, o de estar el Juez Presidente en
> minoría en determinado caso, por el juez de
> mayor antigüedad dentro de la mayoría, después
> de que cada juez se haya expresado y votado
> sobre el caso.[5] Es así que un tribunal de última
> instancia puede alcanzar mejor la categoría de
> tribunal colegiado y conjurar las deficiencias
> de las opiniones representativas no del Tribunal
> sino del criterio de un solo juez.

Empero, un Tribunal de siete jueces no puede atender
la carga actual de recursos y celebrar vistas orales con
frecuencia, por el tiempo de preparación y análisis del
expediente que cada vista y la discusión subsiguiente en
pleno conllevarían para cada uno de los jueces de este
Foro. No hay tiempo para eso con la tarea semanal de casos
nuevos para estudio e informe. Por eso es necesario
reducir la carga individual de casos por juez, lo que sólo
puede hacerse aumentando la composición del Tribunal.

Un tribunal de última instancia puede operar
eficientemente con nueve jueces. Así lo revela nuestra
propia historia y la experiencia de nuestras contrapartes
estatales. Además del Tribunal Supremo de los Estados
Unidos, los estados de Alabama, Mississippi, Oklahoma,
Texas y Washington operan su tribunal de última instancia
con nueve jueces. La mayoría de estos estados tienen una
población similar a Puerto Rico (Alabama con 4.7 millones,
Mississippi con 2.9 millones, Oklahoma con 3.6 millones y
Washington con 6.6 millones de habitantes). Véase,
www.census.gov. De hecho, el aumento en el número de
jueces para atender los problemas particulares de una
jurisdicción no es ajeno a la realidad contemporánea. El
estado de Georgia, que tiene una población de 4.5
millones, actualmente considera aumentar de siete a nueve
el número de jueces de su Tribunal Supremo. Al presente,
esa medida es evaluada por la Asamblea Legislativa de
Georgia. Ga. Senate Bill 429, 10 LC 28 5088.

---

[5] Con ese propósito, el 9 de marzo de 2010 enmendamos la
Regla 5(a) de nuestro Reglamento, 4 L.P.R.A. Ap. XXI-A.
Véase In re Enmda. R. 5, Regl. Trib. Sup., 2010 T.S.P.R.
27, 2010 J.T.S. 36, 178 D.P.R. ___ (2010).

Recordemos que en 1960 se enmendó el Art. V, Sec. 4, de la Constitución de Puerto Rico para permitir el funcionamiento en salas de este Tribunal. Esta disposición fue debatida por la Convención Constituyente aunque no fue incluida originalmente en la Constitución. Informe de la Comisión de lo Jurídico de la Cámara de Representantes de 2 de junio de 1960, sobre la R. Conc. de la C. 24, pág. 4. En los debates de la Convención Constituyente, el delegado, Sr. Miguel A. García Méndez, expuso la posición del Juez Presidente del Tribunal Supremo. Luego de dar por sentado que el Tribunal Supremo debía ser aumentado a siete (7) jueces, el Juez Presidente afirmó que necesitaba la "autorización para dividirse en secciones de tres jueces, según lo determine su propia reglamentación". Diario de Sesiones, supra, pág. 527.

Posteriormente, "[l]a condición cada vez más crítica de los calendarios llevó a la consideración y aprobación en el referéndum especial del 8 de noviembre de 1960 de una enmienda a la sección 4 del artículo V de la Constitución..." y en "su recomendación favorable a tal enmienda, el Tribunal Supremo solicitó el aumento a nueve del número de sus jueces". Comité para el Estudio y la Evaluación del Sistema Judicial, op cit., págs. 3-4.

Para entonces, podían operar divididos en salas los Tribunales Supremos de España, Francia, Bolivia, Colombia, Costa Rica, Cuba, México y El Salvador. Informe de la Comisión de lo Jurídico de la Cámara de Representantes de 2 de junio de 1960, sobre la R. Conc. de la C. 24, pág. 4. Además, esa práctica era permitida en los Tribunales Supremos de los estados de Luisiana, Nebraska, Mississippi, Minnesota, Tennessee y Washington. Id. Esta enmienda se hizo con la previsión de que la composición de jueces en el Tribunal Supremo se iba a aumentar a nueve. Véanse expresiones de los licenciados José Trías Monge, Francisco Ponsa Feliú, Raimundo García Cintrón, Gabriel de la Haba y Luis Blanco Lugo en la vista pública para considerar la enmienda constitucional, O.S.L., Enmienda a la Constitución, Artículo 5, Sec. 4, Récord de la Vista Pública de 20 de mayo de 1960, págs. 8, 14, 21, 26 y 38. Esta medida y el aumento a nueve jueces "facilitaría aún más el trabajo del tribunal". Ponencia del Hon. Hiram Cancio, id., pág. 3.

La eficiencia y productividad de los tribunales de última instancia que tienen nueve jueces y que funcionan en salas, ha sido comprobada de forma empírica. Un estudio de este mismo año concluye que existe una relación directa entre el número de jueces que componen un tribunal de última instancia, su funcionamiento en paneles y la producción de casos. Según el estudio empírico, un tribunal de cinco jueces emite alrededor de 167.5 decisiones al año; uno de siete jueces emite

aproximadamente 183.9 decisiones anualmente; y uno de nueve jueces emite un promedio de 269.5 decisiones al año. V.E. Flango, State Supreme Court Opinions as Law Development, 11 J App. Prac. & Process 105, 116 (2010). Según este artículo, lo que hace que el promedio de decisiones emitidas por los tribunales compuestos por nueve jueces sea más alto es su funcionamiento en paneles. Id. Destaca la productividad del Tribunal Supremo de Mississippi y el de Alabama, que operan en salas o secciones de cinco y tres jueces, respectivamente. Id.

"El funcionamiento del Tribunal en salas, en unión a las otras reformas efectuadas a partir del 1958 [como la composición de nueve jueces], permitió finalmente la descongestión del calendario". Comité para el Estudio y la Evaluación del Sistema Judicial, op cit., pág. 4. Eso es un hecho verificable que no puede ser borrado de nuestra historia por otras consideraciones ajenas a la consecución del bienestar de nuestro sistema judicial.

La enmienda constitucional de 1960 nos brinda otra herramienta para atender el problema de la demora judicial. Como tal, debe ser empleada para atajar el problema que hoy nos ocupa. Como señaló la Escuela de Administración Pública de la Universidad de Puerto Rico en su informe a la Asamblea Constituyente, el trabajo de este Tribunal

> es tan complejo que la capacidad para trabajar en secciones ayudaría a acelerar el despacho de los asuntos; y al mismo tiempo a disminuir notablemente la posibilidad de que se dicten decisiones por un solo juez. Una corte sobrecargada tiende a delegar la redacción de opiniones en un solo miembro, y los otros, por lo tanto, concurren pasivamente, a menos que haya una profunda diferencia de criterio.

> Universidad de Puerto Rico, Escuela de Administración Pública, La nueva constitución de Puerto Rico: Informes a la Convención Constituyente, Madrid, Ediciones de la U.P.R., 1954, pág. 467.

Nos compete a nosotros determinar "cuántas salas deberán crearse, cuántos jueces han de constituir una sala del Tribunal [y su funcionamiento interno], y el número de ellos que han de concurrir en la decisión mayoritaria de una sala, para que dicha decisión constituya la decisión del Tribunal". Informe de la Comisión de lo Jurídico de la Cámara de Representantes de 2 de junio de 1960, sobre la R. Conc. de la C. 24, pág. 5. Este proceso conllevará una revisión profunda de nuestro Reglamento.

Somos conscientes de que todas las medidas que
adoptemos tienen que emplearse adecuadamente para que
sirvan a los propósitos genuinos que las inspiran. En la
enmienda constitucional de 1960 "se autoriza a este
Tribunal a funcionar flexiblemente, en pleno o divido en
salas compuestas por no menos de tres (3) jueces...".
Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 392, 397
(1985) (en reconsideración). Esto "[s]e concibe, desde
todo punto pragmático, y supera la limitación inherente
que representaría para la administración de la justicia la
imposición al Tribunal de restricciones absolutas". Id.

Sin duda, la utilización errónea del funcionamiento
en salas fue un problema en el pasado. El Juez Asociado
señor Negrón García ha expresado que ese sistema es "una
espada de doble filo. Aunque indudablemente ayuda a
agilizar el proceso decisorio, lo hace a costas de la
uniformidad del Derecho". A.S. Negrón García, supra, pág.
10. Ahora bien, precisamente ese raciocinio se debatió en
la Asamblea Constituyente y fue derrotado en las vistas
para la enmienda constitucional del 1960. Véase, O.S.L.,
Enmienda a la Constitución, Artículo 5, Sec. 4, Récord de
la Vista Pública de 20 de mayo de 1960, supra. De todos
modos, esa preocupación puede ser atendida por este
Tribunal por medio de reglamentación. A manera de ejemplo,
las reglas del Tribunal Supremo de Tennessee proveen para
que algunos casos sean atendidos por salas especiales. Las
decisiones de estas salas no son publicadas ni son
vinculantes salvo que la mayoría de los jueces del
Tribunal Supremo lo ordene. Tenn. Sup. Ct. Rule 4.

Para evitar repetir los errores del pasado, debemos
evitar que las decisiones de una sala de este Tribunal
sienten precedente. El error en la década de los 60 fue
ese y no la división del Tribunal en tres salas de tres
jueces.[6] Nuestro Reglamento deberá prescribir las normas
que aseguren la uniformidad de nuestras decisiones.

---

[6] "La discusión y planteamientos de distintos delegados [a
la Asamblea Constituyente] indica un sentir respecto a lo
aconsejable que resultaría que las decisiones emitidas por
salas compuestas por sólo tres (3) jueces, fuesen emitidas
por unanimidad". Sánchez Rodríguez v. López Jiménez,
supra, pág. 394. Para garantizar la amplitud de la
revisión judicial, podría establecerse que cuando no haya
unanimidad de criterio en una sala, el recurso pase al
Tribunal en pleno. También podría enmendarse la Regla 4(b)
de nuestro Reglamento, 4 L.P.R.A. Ap. XXI-A, para
establecer que cuando este Tribunal se divida en salas,
cada moción de reconsideración sea atendida por una sala
distinta a las que intervinieron anteriormente en el
recurso. Eso garantizaría que todos los integrantes del
Tribunal intervengan eventualmente en la consideración de

(continúa...)

Somos conscientes de que esta medida tendrá un impacto económico en las arcas de la Rama Judicial. Sin embargo, ese gasto es ínfimo en comparación con los beneficios que obtendrán las partes que acudan ante nos. Confiamos que las otras Ramas del Gobierno nos asignarán los fondos necesarios para implantar la solicitud que hoy hacemos. Ahora bien, al igual que lo ha hecho el resto del Gobierno, le compete a la Rama Judicial ajustar su presupuesto para garantizar que los recursos se utilicen de la manera más eficiente posible. Es nuestro deber indelegable dirigir fructíferamente nuestros recursos. Así será.

Tampoco podemos olvidar el impacto que tiene la presencia de dos (2) jueces adicionales en este Tribunal. "La razón histórica de la composición de este Tribunal respondió a una preocupación de la Asamblea Constituyente por garantizar una multiplicidad de criterios, enfoques y visiones, que hicieran de la instancia apelativa una alternativa amplia y justa en sus decisiones". Sánchez Rodríguez v. López Jiménez, supra, pág. 394. Cada integrante de este foro aporta su visión particular a las controversias que llegan ante nos. Esas visiones diversas enriquecen el desarrollo del derecho y contribuyen a asegurar que este foro considere todas las consecuencias de nuestras decisiones, en ánimo de impartir justicia.

En 1994, nuestro Pueblo fue consultado para auscultar si quería eliminar de la Constitución la cláusula que nos faculta a solicitar a la Asamblea Legislativa la variación del número de jueces de este Tribunal. Los electores votaron para retener ese mecanismo constitucional,[7] diseñado para reducir o ampliar el número de jueces del Tribunal Supremo cuando las circunstancias así lo aconsejen. Así pues, en vez de fijar en nueve el número de miembros de este Tribunal como se pretendía con la enmienda constitucional propuesta, los electores prefirieron que fuéramos nosotros quienes le manifestáramos a la Asamblea Legislativa cuál entendemos que es el número de jueces que se necesita para realizar nuestra función judicial.

"Los factores históricos tienen importancia, pero las consideraciones básicas deberán ser en términos de la naturaleza, complejidad y cantidad de la tarea".

---

un recurso, cuando las partes agoten el mecanismo reglamentario de la reconsideración.

[7] La votación en la elección efectuada el 6 de noviembre de 1994 fue de 718,272 (54%) en contra y 595,425 (44.8%) a favor de la enmienda constitucional. Véase: http://www.ceepur.org/cgi-in/eventos.pl?evento=1994&voto=2

Universidad de Puerto Rico, Escuela de Administración Pública, op. cit., pág. 466. Nuestro calendario actual y la necesidad de un funcionamiento más transparente y accesible al Pueblo aconsejan que utilicemos ahora ese mecanismo constitucional. Así lo hicimos cuando nuestra sociedad era menos litigiosa, con una población de poco más de la mitad de la actual. Aspiramos a un Tribunal renovado, capaz de enfrentar los retos del Siglo XXI.

Esas son nuestras únicas motivaciones. Algunas personas han preferido imputarle a este Tribunal otros propósitos ajenos a la sana administración de la justicia y al bienestar de todo nuestro Pueblo. Los que lanzan esos ataques olvidan que también habrá quien le adjudique el mismo propósito inadecuado a la oposición a esta medida. Por eso, esas imputaciones desafortunadas e injustificadas no merecen comentarios adicionales. Nuestra función es dirigirnos a nuestro Pueblo directamente y por escrito, como lo hacemos hoy; no mediante rumores, especulaciones o ataques personales. Nos adherimos estrictamente al mandato de estricta "confidencialidad de la información obtenida en el ejercicio de... [nuestras] funciones judiciales...". Canon 18 de Ética Judicial, 4 L.P.R.A. Ap. IV-B. Protegemos así la candidez, amplitud y apertura de nuestras deliberaciones como foro colegiado, y mantenemos nuestra independencia judicial al impedir que se ejerzan presiones externas ajenas a nuestra función.

La imagen de este Tribunal no se lacera cuando fundamentamos y ejercemos la facultad que la Constitución nos confiere para solicitar un aumento en el número de nuestros integrantes. Lo que sin duda nos hace daño como institución es el comentario ajeno a "la debida propiedad y circunspección..." judicial (Canon 14, id.), y la filtración selectiva de nuestras comunicaciones internas como sustituto de la ponderación sosegada y en hermandad entre juezas y jueces. Nuestro interés en deliberar y discutir el contenido de esta Resolución se frustró cuando en lugar de este recinto judicial se escogió la arena política como foro. En respeto a la independencia judicial rechazamos cualquier intento de ejercer presiones externas al ejercicio colegiado de deliberación que siempre hemos defendido y promovido con el mayor celo. Es eso y no esta Resolución lo que compromete la independencia judicial.

Por los fundamentos expuestos, se le solicita a la Asamblea Legislativa que aumente mediante ley la composición del Tribunal Supremo de siete a nueve jueces y asigne los fondos necesarios para ello durante el año fiscal en curso.

Se ordena la publicación inmediata de esta Resolución. Notifíquese de inmediato, por *fax*, teléfono y mediante notificación personal diligenciada hoy mismo por

un alguacil de este Tribunal, a los Secretarios de ambas
cámaras legislativas.

Lo acordó el Tribunal y certifica la Secretaria del
Tribunal Supremo. El Juez Presidente señor Hernández
Denton emitió voto disidente, la Jueza Asociada señora
Fiol Matta emitió voto disidente y la Juez Asociada señora
Rodríguez Rodríguez emitió opinión disidente.



Aida Ileana Oquendo Graulau
Secretaria Tribunal Supremo

# MOVIMIENTO DE CASOS EN EL TRIBUNAL SUPREMO
## Año Fiscal 2009-2010

| Recursos | Casos a Ser Considerados | | | | | | | | Resueltos | | | | | | Casos Pendientes | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pendientes Al inicio | | | | Presentados | Reabiertos | Total | Gran Total | En sus Méritos | | | Otras Disposiciones[1] | Otros | Total | A Considerar por el Tribunal[2] | Sometidos[3] | En Perfeccionamiento[4] | Total Al Finalizar el Año |
| | A Considerar Por El Tribunal | Sometidos | En Perfeccionamiento | Total | | | | | Orden M/C | Regla 50 | Sometidos | | | | | | | |
| APELACIÓN | 36 | 11 | 17 | 64 | 113 | 1 | 114 | 178 | 2 | 0 | 8 | 107 | 0 | 117 | 31 | 19 | 11 | 61 |
| CERTIORARI | 383 | 106 | 117 | 606 | 1147 | 21 | 1168 | 1774 | 40 | 6 | 95 | 964 | 11 | 1116 | 398 | 115 | 145 | 658 |
| JURISDICCIÓN ORIGINAL | 0 | 0 | 0 | 0 | 14 | 0 | 14 | 14 | 0 | 0 | 0 | 0 | 12 | 12 | 1 | 0 | 1 | 2 |
| HABEAS CORPUS | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 |
| MANDAMUS | 0 | 0 | 0 | 0 | 12 | 0 | 12 | 12 | 0 | 0 | 0 | 0 | 10 | 10 | 1 | 0 | 1 | 2 |
| AUTO INHIBITORIO | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| QUO WARRANTO | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| RECURSO GUBERNATIVO | 0 | 4 | 0 | 4 | 3 | 0 | 3 | 7 | 0 | 0 | 2 | 0 | 0 | 2 | 0 | 4 | 1 | 5 |
| CONDUCTA PROFESIONAL | 10 | 14 | 31 | 55 | 75 | 0 | 75 | 130 | 18 | 0 | 10 | 11 | 30 | 69 | 12 | 15 | 34 | 61 |
| INJUNCTION | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CERTIFICACIONES | 0 | 0 | 1 | 1 | 16 | 0 | 16 | 17 | 0 | 0 | 6 | 2 | 4 | 12 | 0 | 2 | 3 | 5 |
| Total | 429 | 135 | 166 | 730 | 1368 | 22 | 1390 | 2120 | 60 | 6 | 121 | 1084 | 57 | 1328 | 442 | 155 | 195 | 792 |

[1] Incluye casos desistidos y/o archivados, desestimados y denegados.

[2] Casos que aún no han sido considerados por el Pleno del Tribunal para denegar o expedir.

[3] Casos que ya están perfeccionados y por lo tanto, listos para ser resueltos en los méritos.

[4] Casos expedidos pendientes de ser perfeccionados y Órdenes de Mostrar Causa expedidas.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

Solicitud para aumentar
el número de Jueces en el          RE-2010-01
Tribunal Supremo

Voto Disidente emitido por el Juez Presidente SEÑOR
HERNÁNDEZ DENTON

San Juan, Puerto Rico, a 5 de noviembre de 2010.

It is confidence in the men and women
who administer the judicial system that is
the true backbone of the rule of law. Time
will one day heal the wound to that
confidence that will be inflicted by today's
decision. One thing, however, is certain.
Although we may never know with complete
certainty the identity of the winner of this
year's Presidential election, the identity of
the loser is perfectly clear. It is the
Nation's confidence in the judge as an
impartial guardian of the rule of law.

Bush v. Gore, 531 U.S. 98, 128-129 (2000)
(Stevens, J., disintiendo).

En el día de hoy, en lo que constituye un

preocupante ejercicio arbitrario de poder, cuatro

miembros de este Tribunal -- que recién han

tomado posesión de sus cargos –– han decidido promover un injustificado aumento en el número de jueces que componen este Foro. Ello, en abierta oposición a todos los estudios, informes y recomendaciones que existen sobre el tema y sin tan siquiera fundamentar válidamente su petición ni procurar el típico consenso que entre nuestros miembros históricamente se ha buscado al solicitar una variación en nuestra composición.

La solicitud que precipitadamente hoy se cursa para aumentar de 7 a 9 el número de nuestros miembros es improcedente. Se trata del mismo aumento que en 1994 el país rechazó cuando se le consultó sobre este asunto mediante referéndum. Al igual que antes, no existe razón legal, práctica o institucional para justificar este incremento. El aumento es innecesario a la luz de nuestro volumen de trabajo, injustificado como cuestión de buena administración de fondos públicos y contrario a la práctica y la doctrina prevaleciente en ésta y otras jurisdicciones. Disiento, pues, del dictamen que indebidamente hoy se toma.

## I.

A. **La solicitud de aumento es injustificada pues (i) se produce en momentos en que nuestro volumen de trabajo no lo amerita; (ii) sólo refleja que los nuevos compañeros aún no se han ajustado al rigor e intensidad del trabajo en este Tribunal e; (iii) ignora que hemos venido atendiendo nuestro calendario apropiadamente, incluso con un número menor de Jueces, sin que éste refleje señales de inestabilidad.**

**La carga de trabajo de este Tribunal no justifica el aumento solicitado.** No nos enfrentamos a incrementos repentinos en la presentación de casos o a un volumen extraordinario que requiera plantearnos la muy desacreditada, y previamente rechazada,[8] alternativa de aumento que hoy solicitan cuatro jueces de este Tribunal. Una mirada a nuestro calendario revela la improcedencia del pedido de los recién nombrados compañeros. Véase Tabla I del Anejo.

Al cierre del año fiscal 2010, este Tribunal tenía 155 "casos sometidos pendientes", término que se refiere a aquellos casos en los que se han completado todos los trámites necesarios para que el Tribunal pueda resolverlos en sus méritos. Esta cifra de casos sometidos resulta consistente con el promedio (141 casos) de la pasada década y apenas implica alrededor de 22 casos por cada Juez; muy por debajo de los sobre 100 casos que anualmente dispone un juez del Tribunal de Apelaciones o de los más de 1,000 casos al año que maneja en su sala un juez del Tribunal de Primera Instancia. Véanse Tablas I, II y III del Anejo.

A diferencia de lo que estiman los Jueces proponentes, no hay justificación alguna para que esa manejable carga de trabajo de 22 casos se les reduzca aún

---

[8]*Véase In re Composición del Tribunal Supremo,* Resolución de 19 de febrero de 1975; Ley Núm. 29 de 28 de mayo de 1975.

más, a alrededor de 17 casos por Juez, con la incorporación de dos Jueces adicionales.

Este asunto de los casos sometidos pendientes no sólo revela mucho sobre la aptitud para el trabajo de los nuevos compañeros sino, y peor aún, sobre la forma en que éstos conciben el ejercicio del poder judicial.

Los Jueces proponentes, bajo la premisa de que simplemente ostentan una mayoría, no perciben la necesidad de hacer un análisis serio de nuestro movimiento de casos. Por ello, aunque admiten que el número de 145 casos sometidos pendientes justificaba que en 1975 se redujera nuestra composición de 9 a 7 Jueces, abiertamente omiten decir que actualmente esa cifra se mantiene esencialmente en el mismo nivel; esto es, 135 casos sometidos pendientes para el año fiscal 2009 y 155 casos sometidos pendientes para el año fiscal 2010, aumento ocurrido después que los nuevos compañeros tomaran posesión de sus cargos.

En su lugar, y para simular que ha habido un aumento en nuestro calendario, simplemente optan por tomar, sin más, el renglón distinto de los casos totales pendientes; que, bajo la incumbencia de los nuevos compañeros, alcanzó 730 al cierre del año fiscal 2009, y 792 al final del año fiscal 2009-2010. Unen así los casos que están listos para ser resueltos (155) y los casos en trámite que aún no se pueden resolver en los méritos, no importa el número de Jueces con que cuente este Tribunal. Naturalmente, este número, por comprender todos los casos pendientes y no

sólo los sometidos, ha de resultar mayor, y que, de hecho, alcanzaba la cifra de 507 para la fecha pertinente en 1975.[9]

Realmente, vemos que el número comparable con los 145 que invocan los Jueces proponentes como un número razonable en 1975, apenas ha aumentado a 155 en el año 2010. ¿Cómo pueden justificar un aumento de dos jueces para atender 10 casos más (de 145 a 155), según el total al cierre del año fiscal 2009-2010? No existe, por supuesto, justificación alguna.

Ahora bien, retomando la mirada a nuestro calendario, podemos ver que el nivel de casos presentados y resueltos tampoco ha experimentado un incremento significativo que justifique expandir nuestra composición. Si examinamos el número de casos presentados durante el año fiscal 2009-2010 (1,390 casos) notamos que éste se ajusta a la experiencia promediada de los últimos diez años (1,297 casos). De hecho, el número actual de casos presentados resulta incluso menor al de los años fiscales 2004-2005 (1,427 casos), 2005-2006 (1,460 casos) y 2007-2008 (1,454 casos). Por su parte, si observamos el número de casos resueltos durante el año fiscal 2009-2010 (1,328 casos) surge que dicha cifra es consistente -- e incluso un poco superior -- al promedio de los últimos diez años (1,261 casos).

[9]*Véase* Informe Anual del Director Administrativo de los Tribunales, correspondiente al Año Fiscal 1974-1975, Tablas A2-A3.

La realidad, pues, es que no ha habido cambios significativos en el número de casos sometidos, presentados o resueltos durante la pasada década. Nuestro volumen actual de casos (2,120 casos) es similar al del pasado año fiscal (1,987 casos), que a su vez es prácticamente idéntico al del año fiscal 2005-2006 (1,986 casos). Esta última cifra tampoco se aparta significativamente (entre un 7% y 8%) con respecto a los años fiscales 2004-2005 (1,850 casos) y 2007-2008 (1,831 casos).

Lo que sí ha podido cambiar, bajo la incumbencia de los cuatro compañeros Jueces Asociados recién nombrados, es el número de casos que aún <u>no</u> han sido considerados por el Pleno, cifra que aumentó de 291 a 429 casos, del 30 de junio de 2008 al 30 de junio de 2009, y que, al cierre de este año fiscal 2010, nuevamente sufrió un incremento de 429 a 442 casos.

Se ha dicho que esta institución, y la comunidad jurídica en general, deben ser generosas en permitir holgura para que nuevos magistrados se ajusten al rigor del trabajo judicial que asumen cuando se incorporan a este Tribunal.[10]  Ello es enteramente cierto. Lo que no puede ser cierto es que un atraso producto de dicho ajuste sea el fundamento para aumentar nuestra plantilla.

---

[10]*Véase* García Padilla & Álvarez González, *El Tribunal Supremo de Puerto Rico: La Corte Pons*, 59 Rev. Jur. U.P.R. 185, 195-196 (1990).

Podríamos entender que los nuevos Jueces se sientan abrumados por no estar acostumbrados al tipo de labor que genera un tribunal de última instancia al que recién se incorporan. Eso nos ha pasado a todos los que hemos ocupado esta posición durante los primeros años de nuestra incumbencia. **Sin embargo, ninguno de nosotros promovió un aumento en la plantilla de esta Curia para reducir la carga de trabajo individual. Con el mayor respeto a los recién llegados compañeros de esta Curia, el llamado, sin embargo, es a ser laboriosos, no a pretender ser eximidos de los rigores del trabajo judicial.**

En este punto debemos resaltar que la realidad es que este Tribunal ha podido atender su calendario apropiadamente (incluso con un número menor de Jueces durante el periodo de vacantes de Jueces Asociados surgidas en el pasado cuatrienio)[11] sin que se hayan observado señales de inestabilidad en éste. Según muestra

---

[11]Durante los años fiscales 2003-2004 y 2004-2005 el Tribunal funcionó con 6 jueces por períodos cortos a raíz del retiro de los entonces Jueces Presidentes señor José A. Andréu García y señora Miriam Naveira Merly. El número se redujo definitivamente a 6 a partir del 10 de abril de 2005 con el retiro del Juez Asociado señor Baltasar Corrada del Río. Para el año fiscal 2007-2008, el número de jueces se redujo a 5 a partir del 3 de diciembre de 2007 con el deceso del Juez Asociado señor Jaime B. Fuster Berlingeri. Por su parte, durante el año fiscal 2008-2009 el número de jueces se redujo a 4 con el retiro del Juez Asociado señor Francisco Rebollo López el 31 de julio de 2008. El 10 de marzo 2009 tomaron posesión del cargo los Jueces Asociados señor Rafael Martínez Torres, señor Erick V. Kolthoff Caraballo y la Jueza Asociada señora Mildred Pabón Charneco.

la próxima tabla, y estudios externos confirman,[12] la resolución de casos incluso reflejó un incremento en relación con las referidas vacantes judiciales.

RELACIÓN ENTRE EL NÚMERO DE JUECES Y LOS CASOS RESUELTOS



De hecho, si analizamos el movimiento de casos desde la última vez que pasamos juicio sobre nuestra composición numérica en el año 1994,[13] para comparar nuestro desempeño antes del surgimiento (años fiscales 1995-2004), y durante la persistencia (años fiscales 2005-2009), de las vacantes de Jueces Asociados surgidas el pasado cuatrienio, podemos ver que durante el periodo de vacantes (años fiscales 2005-2009), y en comparación con el referido periodo que le antecedió (años fiscales 1995-2004), en promedio anual, este Tribunal incluso: (i) resolvió más casos anuales (1,335 casos en lugar de 1,119) y; (ii) dejó menos casos pendientes (477 casos en lugar de 518) aun cuando; (iii)

---

[12]*Véase* Ipsos Public Affairs, pág. 3 (San Juan, Puerto Rico) (26 de febrero de 2010).

[13]Véase *In re Reforma Judicial*, 136 D.P.R. 1, 3 (1994).

se enfrentó a más casos presentados al año (1,397 casos en lugar de 1,081). Nótese, igualmente, que para el periodo 2005-2009 el Tribunal, en promedio anual, redujo su nivel de casos sometidos pendientes (139 en vez de 148) y sólo tuvo 68 casos adicionales anualmente promediados en trámite de perfeccionamiento (400 frente a 332). Véanse Tablas IV y V del Anejo.

Inclusive, si damos una mirada histórica a nuestro calendario y, para fines de referencia, llegamos tan lejos como el inicio constitucional de este Tribunal (años fiscales 1953-1994) para compararlo con la experiencia habida durante el periodo de vacantes (años fiscales 2005-2009), podemos ver que la experiencia promediada de los años 2005-2009 de vacantes arroja (i) menos casos pendientes (477 en lugar de 594), (ii) más casos resueltos (1,335 en lugar de 1,180) y, (iii) un porcentaje promediado superior de casos resueltos (71.2% en lugar de 65.5%), que para los 42 años que comprenden el periodo comparativo promediado de 1953-1994. Véanse Tablas VI y VII del Anejo.

De dicha comparación tampoco surge incremento alguno que justifique tan siquiera considerar aumentar la composición de este Tribunal. No ha habido incrementos significativos en el número promediado de casos presentados (1,397 para el periodo 2005-2009; 1,206 para el periodo 1953-1994) o en el volumen promediado de casos

(1,874 para el periodo 2005-2009; 1,800 para el periodo 1953-1994).

De ordinario, el que nuestro volumen de trabajo actual no sustente un aumento en nuestra plantilla sería suficiente para refutar la petición que hoy se formula. Pero hay más.

**B. El aumento propuesto resulta, además, injustificado por ocurrir en momentos en que se anticipa una reducción en nuestra carga de trabajo así como por ser contrario a la buena administración de fondos públicos y la doctrina prevaleciente en ésta y otras jurisdicciones.**

La actuación de los cuatro compañeros Jueces Asociados es aún más difícil de entender, a la luz de parámetros jurídicos, si tomamos en cuenta que ésta ocurre no solo cuando nuestro volumen de trabajo actual no lo requiere sino, incluso, cuando se anticipa su disminución tras la aprobación de las nuevas Reglas de Procedimiento Civil.[14] Como se sabe, las referidas reglas reducen las instancias en las se puede acudir vía *certiorari* al Tribunal de Apelaciones.[15] Esto limita el universo de casos revisable ante nos y, por ende, reduciría nuestra carga de trabajo. Además, la petición de aumento se produce en momentos en que las estadísticas reflejan una merma aun en la presentación de casos ante el Tribunal de Primera Instancia. Véase Tabla III del Anejo.

---

[14]*Véase* Ley Núm. 220 de 29 de diciembre de 2009, *según enmendada*, 32 L.P.R.A. Ap. V.

[15]*Véase* Regla 52.1 de las Reglas de Procedimiento Civil de 2009, 32 L.P.R.A. Ap. V, R. 52.1.

Resulta, pues, particularmente cuestionable que se pretenda aumentar la composición de este Foro no sólo cuando nuestro volumen de trabajo no lo amerita sino, incluso, justo cuando se anticipa que la carga se reduzca.

**El aumento propuesto resulta injustificado, además, como cuestión de buena administración de fondos públicos. Irónicamente, tres de los compañeros Jueces Asociados que ahora reclaman la millonaria[16] inversión de fondos públicos que supondría incorporar jueces adicionales propuestos, hace poco tomaban "conocimiento judicial" de la crisis fiscal local para sumariamente imponer una medicina de austeridad a miles de trabajadores puertorriqueños;[17] "conocimiento" que súbitamente se ha desvanecido.**

Formular esta solicitud de aumento no es responsable con el país; que atraviesa momentos económicos difíciles y que sería mejor servido si se usaran esos recursos, no para que los nuevos compañeros se sigan reduciendo su manejable carga de trabajo, sino para fortalecer, en todo

---

[16]El costo mínimo de la petición de aumento podría estimarse en alrededor de $1 millón de dólares anuales. Este estimado toma en consideración el gasto por concepto de compensación para los 2 Jueces Asociados adicionales, su personal de apoyo (oficiales jurídicos, secretarias y alguaciles) y equipo (vehículo, celular, materiales y equipo de oficina). No incluye, entre otros, gastos por concepto de espacio físico de oficina, como sería alquiler, compra o construcción de propiedad inmueble.

[17]*Véase* <u>Domínguez Castro v. E.L.A.</u>, res. el 19 de febrero de 2010, 2010 T.S.P.R. 22 (Voto Particular del Juez Asociado señor Rivera Pérez al que se unen los Jueces Asociados señor Martínez Torres, señor Kolthoff Caraballo y la Jueza Asociada señora Pabón Charneco).

caso, otras áreas del sistema judicial, como el Tribunal de Primera Instancia.

Como si lo anterior fuera poco, la petición de aumento también resulta contraria a la práctica y la doctrina prevaleciente en ésta y otras jurisdicciones. Por la mayor parte de nuestra historia constitucional, la composición de este Tribunal ha estado fijada en 7 jueces. Esto no es accidente. Se trata, según nota la *American Bar Association*,[18] de la composición más típica y satisfactoria bajo el esquema jurídico estadounidense, donde la inmensa mayoría de las jurisdicciones estatales (45 estados) tienen tribunales supremos de 7 jueces o menos.[19]

Aunque los nuevos compañeros Jueces Asociados prefieren no abordar este asunto, la realidad es que las 5 jurisdicciones estatales[20] que no siguen la composición típica de 7 jueces, o menos, prevaleciente en el 90% de los estados (45 de 50) difieren marcadamente de Puerto Rico, bien con respecto al volumen de casos presentados, el tamaño de la población que atienden, o el sistema de revisión apelativa existente. Véase Tabla VIII del Anejo.

---

[18]*Véase* American Bar Association, *Standards Relating to Court Organization*, págs. 39-40 (1990).

[19]*Véase* National Center for State Courts, *State Court Statistics: An Analysis of 2007 State Court Caseloads* 92-93 (2009); Dept. of Justice, Bureau of Justice Statistics, *State Court Organization 2004*, págs. 12-14 (2006).

[20]Texas, Washington, Alabama, Oklahoma y Mississippi.

Según advertía el entonces Juez Presidente José Trías Monge,[21] un número alto de jueces en un tribunal supremo (como sería el nuevo total de 9 jueces hoy solicitado) dificulta su labor, en vez de facilitarla, al retrasar la solución de casos y la pauta de normas legales. Este Tribunal conoce esto muy bien pues, en el pasado (1961-1975),[22] experimentamos con un Foro aumentado de 9 jueces, como el ahora propuesto, que tuvo que ser revertido por constituir "una pesada organización de nueve miembros en la que unos estorban a otros".[23]

La literatura jurídica consistentemente refleja, y nuestra experiencia reafirma, que un aumento como el que hoy se pretende es contraproducente para el funcionamiento de este Tribunal. Según indicó el entonces Juez Presidente del Tribunal Supremo federal, Charles Evans Hughes (cuando el Presidente Franklin D. Roosevelt intentó, sin éxito, aumentar indebidamente la composición de dicho foro) un incremento en el número de jueces de un tribunal supremo afecta su eficiencia al haber más jueces para oír, discutir y decidir.[24]

---

[21]*Véase* José Trías Monge, *Cómo fue: Memorias* 270 (2005).

[22]*Véase In re Solicitud a la Asamblea Legislativa sobre aumento en el número de Jueces del Tribunal Supremo,* Resolución de 27 de enero de 1961; Ley Núm. 7 de 6 de mayo de 1961.

[23]Luis Rafael Rivera, *La Justicia en sus manos: historia del Tribunal Supremo de Puerto Rico* 191 (2007).

[24]Carta del Juez Presidente Charles Evans Hughes al senador Burton K. Wheeler (1937), *reproducida en* Gunther & Sullivan, *Constitutional Law* 184 (13th ed. 1997).

Como se ha notado, "los estudios que existen sobre este tema en Estados Unidos y en Puerto Rico demuestran que el aumento en la composición de un tribunal colegiado puede significar más atraso[.]"[25] Esto pues, aunque "un aumento en el número de jueces podría significar más plumas a las que se pueden asignar la redacción de decisiones … también significa más mentes que tendrían que consultarse sobre qué decidir y cómo decidirlo, lo que en ocasiones puede retrasar aún más el proceso decisional."[26]

Es por esta razón que jueces que formaron parte de este Tribunal durante el período que estuvo constituido por 9 miembros describieron el aumento como un "experimento [que] fracasó" y que resultó "dañin[o] a nuestro sistema de justicia".[27] En este sentido, conviene recordar que el fallido experimento de aumento a 9 jueces de 1961 ocurrió en momentos en que nuestro sistema legal carecía de un foro apelativo intermedio.[28] Con el establecimiento de las sesiones apelativas en el Tribunal Superior en 1974, que sirvió de antesala al regreso a un

---

[25]*Véase* Álvarez González, *La Nueva Ley de la Judicatura y la Competencia Obligatoria del Tribunal Supremo: Algunas Jorobas de un Solo Camello*, 65 Rev. Jur. U.P.R. 1, 29 n.177 (1996).

[26]*Véase* García Padilla & Álvarez González*, El Tribunal Supremo de Puerto Rico: La Corte Pons*, 59 Rev. Jur. U.P.R. a la pág. 226 n.121.

[27]*Declaración de Ex-Jueces del Tribunal Supremo*, El Nuevo Día, 1 de noviembre de 1994, pág. 33.

[28]*Véase* Comité para el Estudio y Evaluación del Sistema Judicial, Informe al Tribunal Supremo de Puerto Rico sobre el Tribunal Supremo, pág. 5 (abril, 1965)

Tribunal de 7 jueces por virtud de la legislación de 1975, se pudo desarrollar el camino para subsanar este vacío con la eventual incorporación de un Tribunal de Apelaciones.[29]

Es por ello que el reclamo de expansión de los recién nombrados compañeros Jueces Asociados se torna particularmente injustificado si consideramos que actualmente somos asistidos en nuestra carga apelativa por un tribunal de apelaciones que, con sus 39 jueces, es numéricamente superior a la inmensa mayoría de los foros apelativos intermedios estatales. Con sus 39 jueces, Puerto Rico excede por mucho la mediana de 15 jueces apelativos intermedios que se calcula por estado.[30] De hecho, valga destacar que 11 estados ni tan siquiera tienen un tribunal apelativo intermedio y que, de los 39 que sí lo tienen, Puerto Rico supera a 32 en cantidad de jueces.[31]

La infundada decisión que hoy unos pocos, de los muchos que les han antecedido, toman para procurar una variación en nuestra composición, diverge sustancialmente de lo que ha sido nuestra firme tradición de actuar ponderada y colegiadamente al ejercer la delicada facultad

---

[29]*Véase* José Trías Monge, *Sociedad, Derecho y Justicia* 145-146 (1986); Ley Núm. 11 de 8 de agosto de 1974; Resolución del Tribunal de 20 de septiembre de 1974; Orden del Juez Presidente de 25 de septiembre de 1974.

[30]*Véase* Dept. of Justice, Bureau of Justice Statistics, *State Court Organization, 1987-2004*, pág. 4 (2007).

[31]Véase Dept. of Justice, Bureau of Justice Statistics, State Court Organization 2004 a las págs. 12-14.

que a tales efectos nos concede la Constitución. En la larga historia de este Tribunal, en sólo tres ocasiones (1952,[32] 1961 y 1975) hemos solicitado modificar nuestra composición. Para ello siempre ha habido el más absoluto consenso entre nuestros miembros en cuanto a su procedencia.[33] Hoy, sin embargo, cuatro compañeros Jueces Asociados, sin incluso tener el beneficio de haber ejercido por un tiempo apropiado su cargo, se desvían del entendido institucional que en todo momento nos ha guiado y optan por actuar al margen de la deliberación jurídica y la colegiación que caracterizó nuestros procesos anteriores. Ello empaña seriamente la legitimidad de este Foro.

## II.

Este Tribunal está en condiciones de ejercer su función judicial con el número de jueces que actualmente tiene. Así lo hemos reconocido anteriormente al rechazar, con el aval del propio electorado, el mismo aumento que hoy se pretende. *Véase* In re Reforma Judicial, 136 D.P.R.

---

[32]Véase Resolución del Tribunal de 26 de julio de 1952; Ley Núm. 2 de 4 de agosto de 1952.

[33]Observamos que en 1984 este Tribunal se abstuvo de alterar su composición, notando que se había "suscitado división en el seno del Tribunal sobre el número óptimo deseable" que debemos tener. *Véase In re composición del Tribunal (Art. V, Sec. 3 de la Constitución)*, Resolución de 29 de marzo de 1984.

a la pág. 3; *Referéndum Sobre Enmiendas a la Constitución de Puerto Rico de 1994.*[34]

Insistir en este aumento, sin tener razón válida para ello, temo ocasionará un enorme daño a la legitimidad de este Foro que agrietará los cimientos de nuestro Estado democrático constitucional de Derecho. No podemos, pues, permanecer callados.

La adherencia a la Ley y a un sistema de régimen de derecho está basada en el respeto que socialmente se tiene sobre las instituciones que administran la justicia. *Véase* Bush v. Gore, 531 U.S. 98, 128-129 (2000) (Stevens, J., disintiendo). Nuestra autoridad descansa en el entendido de que actuamos fundamentada e imparcialmente, libre de influencias político-partidistas. Si se percibe que operamos fuera de dicho entendido, se desvanecerá el apoyo y el respeto que nos tiene el país. Sin esa confianza pública, este Tribunal no puede funcionar.

Lo anterior es particularmente importante cuando, como ahora, se trata de variar la composición de este Foro; la principal instancia en la que este Tribunal debe demostrar que sus decisiones emanan de un proceso deliberativo legalmente fundamentado y judicialmente independiente. La legitimidad de este Foro podría verse seriamente comprometida si, ante la ausencia de razones objetivas para sustentar la petición de aumento que hoy se formula, se percibe que los cuatro nuevos compañeros

---

[34]Véase http://www.ceepur.org/cgi-bin/eventos.pl?evento=1994&voto=2.

Jueces Asociados se han apartado del mandato de la Ley para simplemente realizar un *Court-packing,* en su modalidad criolla de **"Court-packing from within the bench",** sacrificando su independencia de las dos ramas políticas del gobierno.

Y es que el aumento que sin justificación hoy procuran los Jueces proponentes se asemeja más al ejercicio del poder político (del que deberían mantener su independencia) que a un acto de la esfera judicial; que se ejerce de manera fundamentada con la Ley como única guía. *Véase* Planned Parenthood v. Casey, 505 U.S. 833, 865-866 (1992).

En una sociedad libre y democrática resulta necesario contar con una judicatura independiente que pueda proteger los derechos del pueblo de intervenciones gubernamentales indebidas. *Véase Diario de Sesiones* 452. Abdicar dicha independencia, para hacer de este Tribunal una marioneta de las ramas políticas, trastoca el delicado balance de poderes en nuestro ordenamiento constitucional en la medida que inmuniza las actuaciones del Estado de una apropiada revisión judicial.

Irónicamente, el mecanismo de variación que hoy indebidamente se desvirtúa estuvo pensado por los constituyentes como garantía de esa independencia. *Diario de Sesiones* 455. Algunos delegados, sin embargo, temieron que aún ese mecanismo no podría proteger al país de "jueces del Supremo [que] resultaran jueces flojos" que

sucumbieran a presiones externas para impulsar, desde adentro, una versión tropical del *Court-packing plan*. *Diario de Sesiones* 538.

Ningún mecanismo, estimaba el delegado Leopoldo Figueroa Carreras, podría ser garantía suficiente contra jueces que, adoleciendo de las "flaquezas [que sienten algunos] por afecto, por cariño, … por ciertas presiones en relación con ciertos deudos o ciertos relacionados, [o] porque les es más cómodo vivir en armonía con el ejecutivo y con los hombres que están en el poder", no estuvieran prestos a detener al que intentara "met[er] su mano pecadora en el Supremo" para realizar un "*Court-packing*". *Id*. Como fundamento a su preocupación, el delegado Figueroa Carreras planteó el siguiente supuesto:

> Supónganse el compañero que … [e]ntonces, dos jueces, que designó el Ejecutivo, se acercan a otros jueces y la situación es la siguiente: los jueces resisten, resisten, resisten. Entonces el Ejecutivo no puede lograr su propósito; pero, como el Ejecutivo tiene ciertos medios a su alcance, porque ser jefe del gobierno de un país con ciento cuarenta y pico de millones de pesos, con todos los jefes de departamentos en los bolsillos, con todas las autoridades a sus pies … da cierta fuerza, da cierta fortaleza. En esas condiciones el jefe ejecutivo, pues, se acerca a través de los dos que eligió; consigue, por ejemplo, dos más; y dos más, pues, son cuatro. Entonces, esos cuatro se reúnen. Cuatro es la mayoría de siete; y entonces piden que se reorganice el Tribunal[.]

> *Diario de Sesiones* 561.

La preocupación planteada, sin embargo, no se creyó posible. Y no se pudo haber creído posible porque la idea de que jueces de este Tribunal abdiquen su independencia y

procuren un indebido aumento en nuestra composición es contraria a todo lo que aspiramos como Pueblo. Luce, no obstante, que no hemos podido escapar el augurio. El intento que por tanto tiempo se temió, ahora parece provenir desde adentro. Se le ha lanzado así un duro golpe a esta institución, al país y a nuestro sistema constitucional democrático del que nos tomará mucho tiempo reponernos.

## III.

En conclusión, no podemos avalar la solicitud que hoy formulan cuatro Jueces Asociados para aumentar de 7 a 9 el número de jueces que componen este Tribunal. El aumento propuesto no tiene justificación alguna. Constituye, más bien, un cuestionable ejercicio del poder judicial que no logra anclarse en razonamiento objetivo alguno. Esto es sumamente preocupante.

En un Estado democrático de Derecho, como el nuestro, a este Tribunal le está vedado actuar por capricho, usando como único criterio que se cuente con cuatro votos para endosar una acción. Nuestras determinaciones tienen que estar subordinadas a la Ley, y así fundamentarse. No existe autoridad para ejercitar el poder arbitrariamente. Así lo exigen las más básicas nociones de seguridad jurídica, o *rule of law*, al que todos estamos sujetos.

Lo anterior es particularmente importante cuando, como hoy, se pretende variar la composición de este Foro en tanto se trata de la instancia más emblemática en la

que debemos amparar nuestras acciones sobre bases jurídicas apropiadas para legitimar el ejercicio de nuestra autoridad. Un cambio en nuestra composición no puede procurarse infundadamente, como pretenden hacer los referidos compañeros Jueces Asociados, por el mero hecho de que existan cuatro votos para ello. Operar fuera de una percepción de objetividad menoscaba la confianza del país en esta institución. Ello lacera nuestro sistema constitucional democrático.

Durante el tiempo que se ha mantenido fija nuestra composición en 7 miembros, múltiples jueces han pasado por este Tribunal y han hecho su trabajo como el país ha esperado de ellos sin solicitar que se aumente nuestra plantilla. ¿Qué ha cambiado en la realidad institucional de este Tribunal que justifique ahora esta solicitud de aumento? **Nada, absolutamente nada, salvo por la llegada a este Tribunal de cuatro nuevos Jueces Asociados que apenas se han incorporado a sus cargos y que hoy demuestran que aún pasan por el proceso de ajuste por el que todos hemos pasado al incorporarnos a este Foro.**

La ausencia de razones objetivas para sustentar el aumento propuesto arroja una oscura sombra sobre este Tribunal que hace cuestionar si se ha guardado la debida distancia del "flujo de la marea" política o, incluso, del lema un poco más burdo de "banquete total", que alude a la idea de controlar este Tribunal a través de jueces que operaran bajo criterios estrictamente partidistas.

Decíamos antes y repetimos ahora, a la larga, es nuestra institución la que sufre y se desprestigia ante el país.[35]

A modo de reflexión final, me parece pertinente compartir algunos datos sobre mi experiencia personal referente a cuando llegué a este Tribunal hace veinticinco años. Como expresé anteriormente, al incorporarme a este Foro como Juez Asociado en 1985, el entonces Juez Presidente José Trías Monge me asignó sobre 55 casos sometidos. Aunque a primera instancia me sentí abrumado e impresionado por la magnitud de esa encomienda, atendí mis nuevas funciones con gran empeño, dedicación y esmero. Y es que no puede ser de otra forma, pues al juramentar como jueces del máximo foro judicial del país nos comprometemos con el Pueblo a laborar incansablemente por la búsqueda de la verdad y la justicia.

El expediente histórico demuestra que desde esos primeros años he trabajado con mucha rigurosidad y dedicación por resolver los casos que me han sido asignados. A la misma vez he servido a este Foro en diversas facetas administrativas, como la presidencia de la Junta Examinadora, incluso antes de juramentar como Juez Presidente del Tribunal.

Todos los jueces que hemos formado parte de esta Curia entendemos que la gran responsabilidad que conlleva esta posición no puede ser tomada de forma ligera.

---

[35] *Véase Enmiendas a la Regla 5 del Reglamento del Tribunal Supremo*, res. el 9 de marzo de 2010, 2010 T.S.P.R. 27 (Op. disidente).

Asimismo, comprendemos que los primeros años en el Tribunal requieren un alto grado de sacrificio para poder ajustar nuestras vidas a la nueva dinámica profesional.

Sin embargo, sabemos que aumentar el número de jueces que componen este Tribunal no va a aliviar la carga de trabajo de los nuevos compañeros. Si tienen una preocupación sobre los procedimientos de manejo de casos lo que corresponde es buscar juntos una solución colegiada sin ceder a la tentación de requerirle a los otros poderes del gobierno que aumenten la plantilla de este Foro. Si no hay razones legítimas y sus fundamentos tratan de meros subterfugios, ¿cuál es la motivación real para aumentar el número de jueces? ¿Es una confirmación de que no tenemos la capacidad para trabajar como el país espera de nosotros o responde a otras motivaciones ajenas al quehacer judicial?

**Hoy, 5 de noviembre de 2010, se escribe un capítulo muy triste en la historia de esta centenaria institución. Tomará más de una generación de Jueces reestablecer su prestigio y volver a ganar la confianza del país.**

Federico Hernández Denton
Juez Presidente

ANEJO

## Tabla I

MOVIMIENTO DE CASOS
AÑOS FISCALES 2000-2001 A 2009-2010[36]

| Año Fiscal | Casos al inicio del año | | | Pres. | Vol. | Res. | Casos al finalizar el año | | |
|---|---|---|---|---|---|---|---|---|---|
| | Sometidos del año anterior | Casos considerados por el Pleno en los que se ha emitido orden a las partes | Casos que no han sido considerados por el Pleno | | | | Casos considerados por el Pleno en los que se ha emitido orden a las partes | Casos que no han sido considerados por el Pleno | Casos sometidos pendientes |
| 2000-01 | 112 | 134 | 191 | 1,138 | 1,575 | 1,143 | 169 | 89 | 174 |
| 2001-02 | 174 | 169 | 89 | 1,154 | 1,586 | 1,218 | 172 | 61 | 135 |
| 2002-03 | 135 | 172 | 61 | 1,116 | 1,484 | 1,030 | 172 | 173 | 109 |
| 2003-04 | 109 | 172 | 173 | 1,187 | 1,641 | 1,218 | 157 | 126 | 140 |
| 2004-05 | 140 | 157 | 126 | 1,427 | 1,850 | 1,324 | 171 | 219 | 136 |
| 2005-06 | 136 | 171 | 219 | 1,460 | 1,986 | 1,544 | 246 | 75 | 121 |
| 2006-07 | 121 | 246 | 75 | 1,276 | 1,718 | 1,341 | 108 | 126 | 143 |
| 2007-08 | 143 | 108 | 126 | 1,454 | 1,831 | 1,211 | 168 | 291 | 161 |
| 2008-09 | 161 | 168 | 291 | 1,367 | 1,987 | 1,257 | 166 | 429 | 135 |
| 2009-10 | 135 | 166 | 429 | 1,390 | 2,120 | 1,328 | 195 | 442 | **155** |
| **Promedio** | 137 | 166 | 178 | 1,297 | 1,778 | 1,261 | 172 | 203 | 141 |

---

[36] Fuente: Oficina de Estadísticas de la Secretaría del Tribunal Supremo. Para efectos de esta tabla se han utilizado las siguientes abreviaciones: Presentados ("Pres."); Volumen ("Vol.") y; Resueltos ("Res.").

ANEJO

## Tabla II

| Año | Jueces Activos | Casos Presentados | Casos Resueltos | Casos por Juez | |
|-----|----------------|-------------------|-----------------|----------------|--|
| | | | | Presentados | Resueltos |
| 2001 | 33 | 3891 | 3958 | 118 | 120 |
| 2002 | 31 | 3929 | 3889 | 127 | 125 |
| 2003 | 33 | 4198 | 3891 | 127 | 118 |
| 2004 | 33 | 4286 | 3910 | 130 | 118 |
| 2005 | 36 | 4279 | 4586 | 119 | 127 |
| 2006 | 39 | 4681 | 4752 | 120 | 122 |
| 2007 | 35 | 4898 | 4748 | 140 | 136 |
| 2008 | 39 | 5625 | 5647 | 144 | 145 |
| 2009 | 37 | 5607 | 5603 | 152 | 151 |
| 2010 | 38 | 5424 | 5436 | 143 | 143 |
| Promedios | 35 | 4682 | 4642 | 132 | 131 |

Volumen de Casos por Juez
Tribunal de Apelaciones[37]

---

[37] Oficina de Estadísticas de la Oficina de Administración de Tribunales.

ANEJO

## **Tabla III**

| Año | Jueces Activos | Casos Presentados | Casos Resueltos | Casos por Juez | |
|---|---|---|---|---|---|
| | | | | Presentados | Resueltos |
| 2001 | 310 | 361464 | 355431 | 1166 | 1147 |
| 2002 | 314 | 366901 | 359049 | 1168 | 1143 |
| 2003 | 307 | 381084 | 389086 | 1241 | 1267 |
| 2004 | 302 | 379716 | 374756 | 1257 | 1241 |
| 2005 | 327 | 368011 | 365822 | 1125 | 1119 |
| 2006 | 328 | 377712 | 377243 | 1152 | 1150 |
| 2007 | 316 | 395259 | 376227 | 1251 | 1191 |
| 2008 | 310 | 367114 | 385534 | 1184 | 1244 |
| 2009 | 306 | 348914 | 355860 | 1140 | 1163 |
| 2010 | 317 | 345092 | 345294 | 1089 | 1089 |
| Promedios | 314 | 369127 | 368430 | 1177 | 1175 |

Volumen de Casos por Juez
Tribunal de Primera Instancia[38]

---
[38] *Íd.*

ANEJO

## **Tabla IV**

MOVIMIENTO DE CASOS
PERIODO 1995–2004[39]

| Año Fiscal | Pendientes al comenzar el año | Presentados | Volumen | Resueltos | % Resueltos | Casos al finalizar el año | |
|---|---|---|---|---|---|---|---|
| | | | | | | Casos sometidos pendientes | En trámite de perfeccionamiento |
| 1994–95 | 803 | 1,247 | 2,050 | 1,432 | 69.85% | 196 | 422 |
| 1995–96 | 618 | 756 | 1,374 | 828 | 60.26% | 156 | 390 |
| 1996–97 | 546 | 722 | 1,268 | 814 | 64.20% | 165 | 289 |
| 1997–98 | 454 | 1,101 | 1,555 | 970 | 62.38% | 163 | 422 |
| 1998–99 | 585 | 1,131 | 1,716 | 1,229 | 71.62% | 133 | 354 |
| 1999–00 | 487 | 1,260 | 1,747 | 1,310 | 74.99% | 112 | 325 |
| 2000–01 | 437 | 1,138 | 1,575 | 1,143 | 72.57% | 174 | 258 |
| 2001–02 | 432 | 1,154 | 1,586 | 1,218 | 76.80% | 135 | 233 |
| 2002–03 | 368 | 1,116 | 1,484 | 1,030 | 69.41% | 109 | 345 |
| 2003–04 | 454 | 1,187 | 1,641 | 1,218 | 74.22% | 140 | 283 |
| **Promedio** | **518** | **1,081** | **1,600** | **1,119** | **69.9%** | **148** | **332** |

[39] Fuente: Periodo 1994–95 al 1999–00: Informes Anuales de la Rama Judicial; Periodo 2000–01 al 2003–04: Oficina de Estadísticas de la Secretaría del Tribunal Supremo.

ANEJO

## **TABLA V**

MOVIMIENTO DE CASOS
PERIODO 2005-2009[40]

| Año Fiscal | Pendientes al comenzar el año | Presentados | Volumen | Resueltos | % Resueltos | Casos al finalizar el año | |
|---|---|---|---|---|---|---|---|
| | | | | | | Casos sometidos pendientes | En trámite de perfeccionamiento |
| 2004-05 | 423 | 1,427 | 1,850 | 1,324 | 71.57% | 136 | 390 |
| 2005-06 | 526 | 1,460 | 1,986 | 1,544 | 77.74% | 121 | 321 |
| 2006-07 | 442 | 1,276 | 1,718 | 1,341 | 78.06% | 143 | 234 |
| 2007-08 | 377 | 1,454 | 1,831 | 1,211 | 66.14% | 161 | 459 |
| 2008-09 | 620 | 1,367 | 1,987 | 1,257 | 63.26% | 135 | 595 |
| **Promedio** | **477** | **1,397** | **1,874** | **1,335** | **71.2%** | **139** | **400** |

---

[40] Fuente: Oficina de Estadísticas de la Secretaría del Tribunal Supremo.

ANEJO

## **Tabla VI**

MOVIMIENTO DE CASOS
COMPARACIÓN DE PROMEDIOS
PERIODOS 1953–1994 y 2005–2009[41]

| Periodos | Promedio Pendientes al comenzar el año | Promedio Presentados | Promedio Volumen | Promedio Resueltos | Promedio % Resueltos |
|---|---|---|---|---|---|
| 1953–1994 | 594 | 1,206 | 1,800 | 1,180 | 65.5% |
| 2005–2009 | 477 | 1,397 | 1,874 | 1,335 | 71.2% |

---

[41] Fuente: Informes Anuales de la Rama Judicial; Oficina de Estadísticas de la Secretaría del Tribunal Supremo.

ANEJO

## Tabla VII

```
                        MOVIMIENTO DE CASOS
                        PERIODO 1953-1994[42]
```

| Año Fiscal | Pendientes al comenzar el año | Presentados | Volumen | Resueltos | % Resueltos |
|---|---|---|---|---|---|
| 1952-53 | 264 | 800 | 1,064 | 685 | 64.38% |
| 1953-54 | 379 | 759 | 1,138 | 650 | 57.12% |
| 1954-55 | 488 | 698 | 1,186 | 680 | 57.34% |
| 1955-56 | 506 | 645 | 1,151 | 524 | 45.53% |
| 1956-57 | 627 | 727 | 1,354 | 824 | 60.86% |
| 1957-58 | 530 | 745 | 1,275 | 593 | 46.51% |
| 1958-59 | 682 | 811 | 1,493 | 835 | 55.93% |
| 1959-60 | 658 | 991 | 1,649 | 955 | 57.91% |
| 1960-61 | 694 | 1,056 | 1,750 | 920 | 52.57% |
| 1961-62 | 830 | 1,152 | 1,982 | 1,346 | 67.91% |
| 1962-63 | 633 | 1,049 | 1,682 | 1,110 | 65.99% |
| 1963-64 | 572 | 1,059 | 1,631 | 1,018 | 62.42% |
| 1964-65 | 613 | 1,111 | 1,724 | 1,126 | 65.31% |
| 1965-66 | 625 | 1,343 | 1,968 | 1,092 | 55.49% |
| 1966-67 | 817 | 1,150 | 1,967 | 1,186 | 60.29% |
| 1967-68 | 779 | 1,089 | 1,868 | 1,120 | 59.96% |
| 1968-69 | 748 | 809 | 1,557 | 952 | 61.14% |
| 1969-70 | 603 | 834 | 1,437 | 857 | 59.64% |
| 1970-71 | 579 | 818 | 1,397 | 821 | 58.77% |
| 1971-72 | 576 | 901 | 1,477 | 813 | 55.04% |
| 1972-73 | 664 | 995 | 1,659 | 1,036 | 62.45% |
| 1973-74 | 623 | 1,069 | 1,692 | 1,065 | 62.94% |
| 1974-75 | 629 | 1,083 | 1,712 | 1,343 | 78.45% |
| 1975-76 | 369 | 1,204 | 1,573 | 1,123 | 71.39% |
| 1976-77 | 450 | 1,248 | 1,698 | 1,309 | 77.09% |
| 1977-78 | 389 | 1,136 | 1,525 | 1,245 | 81.64% |
| 1978-79 | 280 | 1,170 | 1,450 | 1,165 | 80.34% |
| 1979-80 | 285 | 1,382 | 1,667 | 1,308 | 78.46% |
| 1980-81 | 359 | 1,469 | 1,828 | 1,376 | 75.27% |
| 1981-82 | 452 | 1,508 | 1,960 | 1,693 | 86.38% |
| 1982-83 | 267 | 1,669 | 1,936 | 1,649 | 85.18% |
| 1983-84 | 287 | 1,599 | 1,886 | 1,605 | 85.10% |
| 1984-85 | 281 | 1,613 | 1,894 | 1,471 | 77.67% |
| 1985-86 | 423 | 1,656 | 2,079 | 1,540 | 74.07% |
| 1986-87 | 539 | 1,730 | 2,269 | 1,542 | 67.96% |
| 1987-88 | 727 | 1,520 | 2,247 | 1,467 | 65.29% |
| 1988-89 | 780 | 1,701 | 2,481 | 1,539 | 62.03% |
| 1989-90 | 942 | 1,890 | 2,832 | 1,721 | 60.77% |
| 1990-91 | 1,111 | 1,640 | 2,751 | 1,587 | 57.69% |
| 1991-92 | 1,164 | 1,681 | 2,845 | 1,722 | 60.53% |
| 1992-93 | 1,123 | 1,291 | 2,414 | 1,296 | 53.69% |
| 1993-94 | 592[43] | 1,850[44] | 2,442 | 1,639 | 67.12% |
| **Promedio** | **594** | **1,206** | **1,800** | **1,180** | **65.5%** |

## Tabla VIII

---

[42] Fuente: Informes Anuales de la Rama Judicial.

[43] Durante el año fiscal 1992-1993 se refirieron 526 casos al Tribunal de Apelaciones. Por ello, se reflejan 592 casos pendientes al comenzar el año fiscal 1993-1994.

[44] La cifra de 1,850 casos incluye 120 casos recibidos del Tribunal de Apelaciones.

ANEJO

| | NÚMERO DE JUECES EN LOS TRIBUNALES ESTATALES DE ÚLTIMA INSTANCIA EN RELACIÓN A SU RANGO POBLACIONAL Y LOS CASOS PRESENTADOS (Compilación de 2007)[45] | | |
|---|---|---|---|
| Estado | Casos Presentados | Número de Jueces | Rango Poblacional |
| California | 8,984 | 7 | 1 |
| Texas | | | 2 |
| –Supreme Court | 1,086 | 9 | |
| –Court of Criminal Appeals | 8,925 | (9) | |
| New York | 3,770 | 7 | 3 |
| Florida | 2,524 | 7 | 4 |
| Illinois | 2,839 | 7 | 5 |
| Pennsylvania | 3,038 | 7 | 6 |
| Ohio | 2,459 | 7 | 7 |
| Michigan | 2,612 | 7 | 8 |
| Georgia | 1,877 | 7 | 9 |
| North Carolina | 748 | 7 | 10 |
| New Jersey | 3,358 | 7 | 11 |
| Virginia | 2,634 | 7 | 12 |
| Washington | 1,585 | 9 | 13 |
| Massachusetts | 967 | 7 | 14 |
| Indiana | 1,057 | 5 | 15 |
| Arizona | 1,161 | 5 | 16 |
| Tennessee | 1,085 | 5 | 17 |
| Missouri | 823 | 7 | 18 |
| Maryland | 886 | 7 | 19 |
| Wisconsin | 988 | 7 | 20 |
| Minnesota | 774 | 7 | 21 |
| Colorado | 1,534 | 7 | 22 |
| Alabama | 1,843 | 9 | 23 |
| South Carolina | 1,706 | 5 | 24 |
| Louisiana | 2,497 | 7 | 25 |
| Kentucky | 998 | 7 | 26 |
| Puerto Rico | -- | -- | 27 |
| Oregon | 1,182 | 7 | 28 |

---

[45] Fuente: National Center for State Courts, *Examining the Work of State Courts: A National Perspective from the Court Statistics Project* 44 (2009); National Center for State Courts, *State Court Statistics: An Analysis of 2007 State Court Caseloads* 149–153. La información reportada se refiere al año 2007, salvo para las siguientes jurisdicciones: Nevada (2006), New Hampshire (2006), New Jersey (2005), New Mexico (2006) y Oklahoma– Tribunal Supremo (2006). Deben advertirse las siguientes diferencias en la forma en que los estados subsecuentes han reportado la información sobre casos presentados:

> Connecticut—Supreme Court (Grand total incoming … data do not include bar discipline/eligibility appeals) … Georgia—Supreme Court (Grand total incoming … data do not include advisory opinion proceedings) … Kansas—Supreme Court (Grand total incoming data do not include appeal by right administrative agency appeals) … Pennsylvania—Supreme Court (Grand total incoming data do not include bar/judiciary proceedings) … Texas—Court of Criminal Appeals (Grand total incoming … data do not include certified questions) … Utah—Supreme Court (Grand total incoming data do not include death penalty appeals by right).

National Center for State Courts, *State Court Statistics: An Analysis of 2007 State Court Caseloads* 153 (paréntesis añadidos).

ANEJO

| | | | |
|---|---|---|---|
| Oklahoma | | | 29 |
| –Supreme Court | 1,856 | 9 | |
| –Court of Criminal Appeals | 1,287 | (5) | |
| Connecticut | 223 | 7 | 30 |
| Iowa | 2,197 | 7 | 31 |
| Mississippi | 1,143 | 9 | 32 |
| Arkansas | 613 | 7 | 33 |
| Kansas | 1,057 | 7 | 34 |
| Utah | 564 | 5 | 35 |
| Nevada | 2,198 | 7 | 36 |
| New Mexico | 623 | 5 | 37 |
| West Virginia | 3,954 | 5 | 38 |
| Nebraska | 541 | 7 | 39 |
| Idaho | 785 | 5 | 40 |
| Maine | 774 | 7 | 41 |
| New Hampshire | 964 | 5 | 42 |
| Hawaii | 248 | 5 | 43 |
| Rhode Island | 358 | 5 | 44 |
| Montana | 751 | 7 | 45 |
| Delaware | 666 | 5 | 46 |
| South Dakota | 405 | 5 | 47 |
| Alaska | 412 | 5 | 48 |
| North Dakota | 366 | 5 | 49 |
| Vermont | 530 | 5 | 50 |
| District of Columbia | –– | –– | 51 |
| Wyoming | 307 | 5 | 52 |

Oklahoma
–Supreme Court                 1,856        9
–Court of Criminal Appeals     1,287        (5)
Connecticut                    223          7          30
Iowa                           2,197        7          31
Mississippi                    1,143        9          32
Arkansas                       613          7          33
Kansas                         1,057        7          34
Utah                           564          5          35
Nevada                         2,198        7          36
New Mexico                     623          5          37
West Virginia                  3,954        5          38
Nebraska                       541          7          39
Idaho                          785          5          40
Maine                          774          7          41
New Hampshire                  964          5          42
Hawaii                         248          5          43
Rhode Island                   358          5          44
Montana                        751          7          45

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


*In re:*


Solicitud para aumentar el          RE-2010-01
número de jueces en el
Tribunal Supremo


Voto Disidente emitido por la Jueza Asociada señora FIOL MATTA


En San Juan, Puerto Rico, a 5 de noviembre de 2010.

La decisión de cambiar la composición del Tribunal Supremo no es propiamente una decisión adjudicativa. Al tomarla, el Tribunal no sopesa los argumentos de unos litigantes ni examina la prueba que cada uno ha presentado para determinar si los tribunales de instancia y apelativo aplicaron correctamente el derecho. La decisión de cambiar el número de jueces de este Tribunal afecta a la institución que salvaguarda y representa nuestra democracia. Porque lo que define y permite nuestra democracia, que es lo mismo que decir lo que protege nuestras libertades y garantías constitucionales, es la seguridad y

tranquilidad de que una institución que actúa con independencia del juego político tendrá la última palabra sobre las actuaciones de las ramas Ejecutiva y Legislativa, y que lo hará desapasionadamente, siguiendo procesos determinados y aplicando normas de Derecho.

Por eso, lo que se decide hoy día no es otra decisión judicial. Es una decisión *institucional* y como tal debió haberse tomado por la institución del Tribunal Supremo y no por un grupo de jueces que, por ser cuatro, constituyen la mayoría mínima requerida para decidir un caso cualquiera en este Tribunal.[46]

I.

Es cierto que la Constitución no expresa en tantas palabras que la decisión de variar el número de jueces asociados debe tomarse por consenso. Pero sí requiere que sea a petición "del propio Tribunal Supremo", no "de una mayoría

---

[46] "Las decisiones del Tribunal en pleno –una de las cuales es esta Resolución– se adoptan por la mayoría de los jueces que intervienen". Resolución mayoritaria, In re: Solicitud para aumentar el número de jueces en el Tribunal Supremo (2010), a la pág. 3. Escudándose en la disposición de nuestro Reglamento que así provee, ese grupo de cuatro jueces ignoró que esta curia está compuesta por siete personas. Amparados en una regla que se refiere a las decisiones sobre casos civiles, criminales y de conducta profesional y judicial, y no a las resoluciones sobre el funcionamiento del Tribunal, mis compañeros descartaron el valor de la deliberación en una institución diseñada con ese objetivo; desecharon la idea de que la articulación de nuestro ejercicio judicial merece una discusión seria entre todos los jueces y todas las juezas que integramos el Tribunal Supremo del País. *Véase* Regla 4(a) del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. XXI-A.

del Tribunal".[47] Esa disposición, como tantas otras disposiciones constitucionales, ha sido objeto de interpretación por el Tribunal, interpretación que, como las demás, debe considerarse vinculante para entender y precisar su contenido.

¿Y dónde está esa interpretación?, dirán mis compañeros de la Mayoría, ¿dónde están las palabras que requieren un consenso para tomar esta decisión? A eso respondo: no toda palabra está escrita.[48] Si para interpretar algo tan cotidiano

---

[47] *Véase* Artículo V, sección 3, Const. P.R. De acuerdo con José Trías Monge, el propósito de que fuera el Tribunal el que solicitara el aumento de jueces fue, precisamente, garantizar constitucionalmente la independencia judicial, lo cual fue visto con buenos ojos por el Congreso de los Estados Unidos, por entender que así se protegía al Tribunal de los intentos de controlarlo mediante la llamada estrategia del "court packing". J. Trías Monge, El sistema judicial de Puerto Rico, San Juan: Editorial de la Universidad de Puerto Rico (1978), pág. 120. Sin embargo, hubo quienes temieron que sirviera para todo lo contrario. Entre éstos, el delegado Leopoldo Figueroa Carreras, en la Convención Constituyente, manifestó preocupación por que la disposición permitiera manipular políticamente a los jueces. Sobre esto, expresó: "[E]stoy mirando para el futuro, estoy visualizando a lo lejos, porque vosotros sabéis de hoy, yo sé que vosotros vivís muy confiados de la mayoría, cuatrocientos mil votos os tienen embriagados, esa borrachera del triunfo que vosotros sentís no os deja razonar, no os deja reflexionar, no os deja ser ecuánimes, no os deja que la luz de la razón, las más de las veces, sea la que ilumine vuestras actuaciones, pero yo os recuerdo, amigos, ¿qué garantía podría haber con un ejecutivo poco escrupuloso que empieza a maniobrar con los señores del Supremo y jueces que pudieran…? […] Suponed una situación como ésta, con un ejecutivo poco escrupuloso, que metiera su mano pecadora en el Supremo y que los jueces del Supremo resultaran jueces flojos y que viniere entonces la petición a la Asamblea Legislativa. ¿Qué estarías haciendo vosotros? ¿Qué habrías hecho? Pues habrías abierto la puerta a una inmoralidad política y habrías echado una sombra sobre la Constitución de Puerto Rico". I Diario de Sesiones de la Convención Constituyente, pág. 538 (2003).

[48] En diversas áreas del Derecho se ha reconocido la existencia de normas que no están, necesariamente, plasmadas en un texto.

(continúa...)

como un contrato nuestro ordenamiento nos remite no sólo a su

En la Convención Constituyente, al presentarse el Informe de la Carta de Derechos sobre la presunción de inocencia y su importancia en nuestro ordenamiento, se hizo referencia a "nuestra constitución no escrita". IV Diario de Sesiones de la Convención Constituyente, pág. 2569 (2003). En el contexto específico del aumento de jueces en el Tribunal Supremo, el profesor Luis Rafael Rivera Rivera plantea que "sería muy delicado enviar una propuesta a la Legislatura sin un consenso en el ámbito del Tribunal, *como ha sido la regla no escrita*". L. R. Rivera Rivera, Los bemoles del gigantismo judicial (2010) (en proceso de publicación, en poder de la autora) (Énfasis suplido). *Véase además* la referencia al "precepto de ley no escrita y tradicional" hecha por el Juez Asociado Negrón García en Conv. Sesión Especial Conf. Judicial, 120 D.P.R. 838, 844 (1988). Por una norma no escrita fue que el Tribunal Supremo de los Estados Unidos decidió el famoso caso de Papachristou v. City of Jacksonville, 405 U.S. 156, 164 (1972) cundo el Juez Douglas habló de los "unwritten amenities" que forman parte de la tradición constitucional de ese país. En el contexto contributivo también se recurre a la fuente no escrita. "[N]on-written operative rules […] serve an hermeneutic function because they provide *ex ante* possible interpretations". Carlo Garbarino, An Evolutionary Approach to Corporative Taxation: Methods and Agenda for Research, 57 Am. J. Com. L. 677, 696 (2009). Incluso, algunos tratadistas europeos han optado, al escribir sobre las fuentes de derecho privado, por publicar dos textos: uno sobre fuentes escritas y otro sobre fuentes no escritas. Rodolfo Sacco, La fonti non scritte (1999). Este asunto también ha sido fuente de análisis por el derecho comparado, particularmente en cuanto a la multiplicidad de fuentes jurídicas que deben emplearse al momento de interpretar: "[Multiplicity] means that a non-written element exists between legal source and its interpretation, or it proves that a written rule does not have the force that would be necessary to replace an old customary rule". Lama Abu-Odeh, The Politics of (Mis)recognition: Islamic Law Pedagogy in American Academia, 52 Am. J. Comp. L. 787, n. 52 (2004).

De igual forma, existe la costumbre, que es "una fuente de derecho enmarcada dentro del principio de equidad y la cual ha sido ampliamente utilizada". Fajardo v. Departamento de Instrucción Pública, 126 D.P.R. 619, 639 (1990, Opinión Disidente del Juez Asociado Hernández Denton), citando a M. Albaladejo, I Comentarios al Código Civil y compilaciones forales, Jaén: Ed. Rev. Der. Privado, págs. 48-51. Hemos empleado la costumbre como "fuente de interpretación" en el contexto penal. Pueblo v. Díaz Urbino, 160 D.P.R. 1, 28 (2003). También lo hemos hecho en el derecho sucesorio, en donde hace falta "examinar, entre otros asuntos, la cultura, las costumbres". Moreda Toledo v. Roselli, 150 D.P.R. 473, 482 (2000).

texto, sino a "los actos coetáneos y posteriores" que rodean su concreción,[49] cuánto más podrán decirnos las actuaciones, los actos, de este Tribunal en las pocas ocasiones en que ha expresado la posibilidad de cambiar su composición.

Como veremos, esos actos de quienes nos precedieron no sólo indican, sino que gritan a voz partida que la decisión de variar la composición de este Tribunal es constitucional solamente cuando se toma por consenso.  Sólo así es que puede decirse que la petición provino, como requiere la Constitución, "del propio Tribunal Supremo".[50]

## II.

Son aleccionadores la seriedad y el sosiego demostrados por el Tribunal y la Rama Legislativa en las otras ocasiones en que abordaron la posibilidad de cambiar el número de jueces

---

[49] Artículo 1234, Código Civil de Puerto Rico, 31 L.P.R.A. sección 3472.

[50] Según explicó el delegado Ernesto Ramos Antonini, en su carácter de presidente de la Comisión de la Rama Judicial de la Convención Constituyente, el propósito fundamental de este precepto era evitar "la intervención más flagrante contra la independencia del poder judicial" mediante el aumento o disminución de la cantidad de jueces en el momento en que "cualquier legislatura o ejecutivo, juntos, tuvieran el deseo o el propósito de, en alguna forma, lograr, mediante una variación del Tribunal Supremo, decisiones que no fueran las necesariamente mandadas por el criterio jurídico". I Diario de Sesiones de la Convención Constituyente de Puerto Rico, pág. 455 (2003). "El propósito de eficiencia en la organización y funcionamiento de la Rama Judicial está íntimamente vinculado y depende fundamentalmente, repito, de la independencia del poder judicial", indicó Ramos Antonini. Id., pág. 452. Como sabemos, las sociedades democráticas contemporáneas valoran altamente la independencia de la rama judicial frente a otras instituciones que detentan el poder. D. E. Herrendorf, El poder de los jueces. Cómo piensan los jueces que piensan, Buenos Aires: Abeledo-Perrot (3ra ed., 1998), pág. 37.

de este Tribunal. Hasta los miembros de la Convención Constituyente optaron por dar tiempo al estudio a fondo de las bondades de un número mayor al de cinco jueces, a pesar de que los propios jueces del cuerpo pidieron el aumento en las vistas previas a la Convención.[51] El resultado de esta decisión fue que, en 1952, se aumentó el Tribunal a siete jueces, por legislación, a petición del Tribunal, según se había discutido por varios años y se había avalado por consenso.[52]

Tras la aprobación de la Constitución del Estado Libre Asociado y de la Ley Orgánica de la Judicatura de 1952, el asunto de la composición numérica del Tribunal Supremo se consideró nuevamente en 1960. A diferencia del proceso atropellado que hoy enfrentamos, el aumento en los integrantes

---

[51] De acuerdo con la discusión en la Convención Constituyente, la razón para no aumentar la composición del Tribunal a siete jueces en la misma Constitución fue permitir que la Asamblea Legislativa evaluara *con detenimiento* si realmente el remedio para el problema de exceso de trabajo de los cinco jueces que componían el Supremo en ese momento era aumentar su número. Entendían que, *para tomar tal decisión, no bastaba un mero testimonio, aunque fuera de jueces del Tribunal Supremo*. Véase I Diario de Sesiones de la Convención Constituyente, pág. 521 (2003). Tampoco era suficiente que la medida y sus fundamentos se hubieran estado considerando desde 1938, cuando se solicitó al Senado de Estados Unidos que aumentara el número de jueces debido al alza en el volumen de trabajo y la diversidad de asuntos nuevos presentados. Si empleamos el principio hermenéutico de analizar los actos coetáneos y posteriores para adscribirle intención al actor de éstos, como hemos descrito anteriormente, la conducta de la Convención Constituyente revela que la petición de aumentar la cantidad de integrantes del Tribunal Supremo requiere una expresión institucional y no la mera anuencia de un número de jueces.

[52] La petición se había repetido en diversas ocasiones, incluso ante la Comisión de la Rama Judicial de la Convención Constituyente. *Véase* Resolución del Tribunal Supremo de Puerto Rico solicitando el aumento de su composición, aprobada el 26 de julio de 1952 y recogida en la ley que avaló el pedido: Ley Núm. 2 de 4 de agosto de 1952.

de este Tribunal hace más de 50 años fue producto del consenso. El anuncio del Tribunal solicitando una ampliación de su composición no fue un acto unilateral de una mayoría de un voto, sino el esfuerzo concertado de toda nuestra estructura de gobierno, y tuvo como elementos centrales la participación directa del Pueblo y el acuerdo general dentro y entre las ramas.

Dicen que quien no aprende de la historia está condenado a repetir sus fracasos. Un ejemplo claro de esto es la intención expresada en la Resolución que hoy aprueba la Mayoría de que el Tribunal se divida en salas. El aumento propuesto en 1960 tenía ese mismo objetivo, y para eso se consultó al Pueblo y éste aprobó una enmienda constitucional.[53] El proceso que aumentó el número de jueces de este Tribunal a nueve, por única vez en nuestra historia constitucional, fue producto del consenso al interior del Tribunal y de la Asamblea Legislativa, así como del acuerdo de la Rama Ejecutiva y del favor contundente del Pueblo.[54] Al igual que la

---

[53] La Asamblea Legislativa aprobó, por unanimidad, la Ley número 121 de 13 de julio de 1960 ordenando la celebración de un referéndum a esos fines, que se llevó a cabo el 8 de noviembre de 1960. La enmienda fue aprobada por el electorado. El 27 de enero de 1961, por voz del Juez Presidente Negrón Fernández, el Tribunal solicitó a la Asamblea Legislativa, por unanimidad, que aumentara el número de jueces asociados a ocho. Resolución Solicitud a la Asamblea Legislativa sobre aumento en el número de Jueces del Tribunal Supremo, 27 de enero de 1961.

[54] La Asamblea Legislativa acogió la petición del Tribunal al aprobar la Ley número 7 de 6 de mayo de 1961. Esta ley fue aprobada mediante votación unánime en la Cámara de Representantes y con solamente tres votos en contra en el Senado. Es curioso señalar que durante el debate de esta medida, el Senador Carrasquillo preguntó por qué, si el

(continúa...)

aprobación de nuestra Constitución, *fue un proceso integrado y producto de un consenso social generalizado*. No fue el resultado del cálculo superficial de una mayoría incidental.

A pesar de ese consenso, la realidad es que el mecanismo de operar en salas no funcionó. Si bien tuvo un impacto en nuestro calendario de casos, el derecho puertorriqueño sufrió de falta de cohesión, integración, coherencia y rumbo.[55] A sólo cuatro años de iniciarse el experimento, el Tribunal decidió reevaluarlo. Ese proceso de reevaluación no fue atropellado ni improvisado. No fue discutido individualmente entre algunos jueces excluyendo a los demás. En vez de aprobar una Resolución, aunque fuera por consenso, solicitándole a la Asamblea Legislativa que bajara el número de jueces, nombramos un Comité para que evaluara el funcionamiento del propio

---

Tribunal Supremo de los Estados Unidos, un país considerablemente más grande que el nuestro, tenía nueve jueces, era necesario tener el mismo número de jueces en nuestro propio Tribunal. Diario de Sesiones, Asamblea Legislativa (Senado), Vol. 14, T. 1, 31 de enero de 1961, pág. 110. También son dignas de mencionarse las expresiones del Senador Delgado Reyes en su Voto Explicativo sobre la importancia de que el Tribunal desempeñe "sus delicadas funciones con la reflexión y deliberación que ellas exigen". Diario de Sesiones, Asamblea Legislativa (Senado), Vol. 14, T. 1, 7 de febrero de 1961, pág. 140. Temo que ese consejo no ha sido acogido por la Mayoría de este Tribunal.

[55] *Véase* A. García Padilla y J. J. Álvarez González, El Tribunal Supremo de Puerto Rico: La Corte Pons, 59 Rev. Jur. U.P.R. 185, 227 (1990). A pesar de que la Resolución de la que disentimos cita en cuatro ocasiones este artículo de los profesores Álvarez González y García Padilla, la Mayoría que la redacta hace caso omiso a las advertencias de sus autores en cuanto a que el sistema de salas fue acertadamente descartado hace décadas y "debe permanecer en el rincón del olvido". *Íd*.

Tribunal Supremo. En su Informe, el Comité concluyó que la operación en salas fue un error.[56]

El 19 de febrero de 1975, tras más de una década de evaluación, y tras un proceso de estudio y ponderación, este Tribunal, *nuevamente por unanimidad*, solicitó a la Asamblea Legislativa que restaurara su composición numérica anterior. Lo que manifestamos en aquella Resolución revela que la solicitud de 1975 fue producto de la experiencia y el consenso, y no de la especulación o el atropello. Ante los eventos actuales, lo que dijimos en aquel entonces resulta también aleccionador:

> [E]s nuestro criterio que un Tribunal Supremo compuesto de un Juez Presidente y seis Jueces Asociados puede con toda eficiencia atender las necesidades de justicia del país; significaría economías de importancia; y podría demostrar, conforme a la experiencia de otras jurisdicciones, que *el remedio a la congestión de casos y a la demora en su trámite no consiste necesariamente en el aumento continuo de jueces.*[57]

En 1984, los jueces consideraron nuevamente la posibilidad de modificar la composición del Tribunal. Era aún un diálogo interno cuando el Tribunal, sin obligación de hacerlo, decidió informárselo a la comunidad. Mediante Resolución, informamos que había una división en el seno del Tribunal sobre el número óptimo deseable de miembros *y que por*

---

[56] *Véase* Comité para el Estudio y la Evaluación del Sistema Judicial, Informe sobre el Tribunal Supremo, abril de 1965, págs. 4-5.

[57] Resolución Re: Composición del Tribunal Supremo, 19 de febrero de 1975 (Énfasis suplido). Esta petición unánime que hiciéramos fue aprobada con un solo voto en contra en el Senado de Puerto Rico y por una mayoría abrumadora de la Cámara de Representantes.

*ello se había acordado no recomendar a la Asamblea Legislativa un cambio* en nuestra composición.[58] Es decir, ante la falta de consenso y unanimidad entre los jueces, el Tribunal entendió que lo que procedía era no hacer una solicitud dividida de cambio. En aquel entonces, el tribunal colegiado salió fortalecido. Lamentablemente, hoy no hemos actuado con esa responsabilidad y ese respeto institucional.

En 1994, hubo un nuevo intento de aumentar el número de integrantes de este Tribunal.[59] Esa vez, no fue el producto de un análisis ponderado al interior del cuerpo, sino de una propuesta de campaña de un partido político.[60] La razón para el aumento se articuló esta vez, no como una respuesta a necesidades funcionales del Tribunal, sino como la búsqueda de un "balance ideológico" entre sus miembros.[61] Lo que sucedió fue descrito por el profesor José Julián Álvarez González como la versión tropical del "Court Packing Plan".[62]

---

[58] Resolución Re: Composición del Tribunal (Art. V, Sec. 3 de la Constitución), 29 de marzo de 1984.

[59] Ley número 49 de 2 de agosto de 1994.

[60] *Véase* J. J. Álvarez González, La Nueva Ley de la Judicatura y la Competencia Obligatoria del Tribunal Supremo: Algunas Jorobas de un Solo Camello, 65 Rev. Jur. U.P.R. 1, 27 (1996).

[61] Sobre el llamado "desbalance ideológico" como razón para aumentar la composición del Tribunal, *véase* Berríos Martínez v. Gobernador II, 137 D.P.R. 195, 274 (1994, Opinión Disidente del Juez Asociado Negrón García).

[62] "No es un secreto que el tema de la composición del Tribunal Supremo fue uno de mucho interés para la administración Rosselló. La plataforma electoral del partido de gobierno propuso una enmienda constitucional para fijar el número de los jueces del Tribunal en nueve y para eliminar su facultad constitucional exclusiva para promover cambios en el número de sus componentes. En distintos momentos se adoptaron diversos
(continúa...)

El partido que hizo la propuesta de añadir jueces al Tribunal Supremo ganó las elecciones en 1992, lo cual podía interpretarse como un mandato en esa dirección. Sin embargo, cuando se le preguntó directamente al Pueblo su opinión sobre el asunto, su respuesta fue contundentemente en contra, demostrando así que la "marea" electoral no siempre otorga un cheque en blanco. La falta de consenso en el proceso de 1994 se notó, no únicamente en que el Tribunal no solicitó el cambio propuesto, sino también en el rechazo contundente del Pueblo a la idea de aumentar el número de jueces de su más alto Tribunal. En el Referéndum de 1994, el electorado no sólo reafirmó que las modificaciones en nuestra composición deben surgir "del propio Tribunal Supremo", según dispone la Constitución, sino que rechazó por unos 120,000 votos la propuesta del partido de gobierno de una enmienda

---

cursos de acción con un objetivo común: permitir al Gobernador hacer nombramientos inmediatamente al Tribunal Supremo. En orden cronológico, cuatro fueron estos cursos de acción. Primero, el Gobernador intentó que el propio Tribunal Supremo le entregara dos nombramientos, al anunciar que accedería a una solicitud del Tribunal para aumentar a nueve sus jueces. Segundo, la Asamblea legislativa aprobó y el Gobernador firmó una enmienda a la Ley de Retiro de la Judicatura que redujo los requisitos establecidos para que los jueces del Tribunal Supremo se retiren con pensión completa. De esta forma, la administración Rosselló invitó *sotto voce* a por lo menos dos jueces del Tribunal Supremo a que abandonaran el estrado sin consecuencias económicas. Tercero, cuando nada de lo anterior rindió los frutos deseados, se aprobó una nueva Ley de la Judicatura que, por diseño específico y consciente, como veremos, abultó dramáticamente el calendario del Tribunal Supremo. Finalmente, la nueva administración decidió proponer una enmienda a la Constitución." J. J. Álvarez González, La Nueva Ley de la Judicatura y la Competencia Obligatoria del Tribunal Supremo: Algunas Jorobas de un Solo Camello, 65 Rev. Jur. U.P.R. 1, 27-28 (1996).

constitucional para aumentar a nueve los jueces del Tribunal Supremo.[63]

Hoy la Mayoría ha optado por eliminar al Pueblo de la ecuación.[64] Hoy 4 votos valen más que los de 712,026 puertorriqueños y puertorriqueñas que en 1994 rechazaron su propuesta.

III.

Pero hay más. Nuestro Tribunal es claramente un foro colegiado, lo cual significa, en su sentido básico, que es un cuerpo cuyos miembros deliberan *en conjunto* antes de tomar decisiones.

Hace cinco décadas, señalamos que "la existencia de un tribunal colegiado de última instancia sólo se justifica porque emite sentencias que son *colectivas*; esto equivale a decir que se obtienen mediante un proceso de deliberación y de discusión entre varios jueces y que reflejan principios

_____

[63] Las palabras del profesor Álvarez González respecto a esto son tristemente proféticas: "[e]n última instancia, el estado de nuestro sistema judicial no es aun peor hoy, gracias a la intervención valiente de 712,026 puertorriqueños [y puertorriqueñas] que prohibieron que se le asestara el puntillazo a nuestra judicatura. Nada garantiza que esa ciudadanía sacará la cara por nosotros nuevamente". Álvarez González, *supra*, pág. 81.

[64] Esto contrasta con la Exposición de Motivos de la Ley número 49, *supra*, cuando la Asamblea Legislativa se expresó en cuanto al rol del Pueblo en la decisión de aumentar la composición del Tribunal. "El fortalecimiento del sistema democrático requiere la participación plena del pueblo en sus asuntos de gobierno… para que sea el pueblo, con su voto, el que determine la composición del Tribunal Supremo, de manera que se mejore y agilice la atención de asuntos ante ese foro". Leyes de Puerto Rico 1994, págs. 207-208.

jurídicos cuya sabiduría es superior a la que cada juez aisladamente podría alcanzar mediante su esfuerzo individual. Para ese fin se creó y existe el Tribunal Supremo de Puerto Rico".[65]

En Pueblo v. Rosario González, expusimos que "para impartir justicia y elaborar doctrinas jurídicas adecuadas, un tribunal colegiado tiene que disponer del sosiego y del reposo intelectual necesarios, sin los cuales toda discusión entre mentes debidamente instruidas es imposible".[66] La misma reflexión sosegada es necesaria para evaluar propuestas sobre la organización de nuestro cuerpo, como la que se ha adoptado hoy. Las medidas que impactan el funcionamiento del Tribunal requieren una atención especial y un análisis cabal, porque el Tribunal es una institución y los actores dentro de las instituciones no operan sólo en el momento en que pertenecen a éstas, sino que se proyectan también en el futuro.

En las decisiones cotidianas, no vacilamos en afirmar que la mayoría manda. Pero el genio de nuestro diseño constitucional, y de los profundos valores de dignidad, respeto, comunidad y hermandad que le acompañan, parten de un sentimiento mayor: cuando se trata del quehacer mismo de un pueblo, del futuro institucional de un país, de decisiones trascendentales que afectarán la vida de millones de nuestros compatriotas, del rumbo colectivo que hemos de emprender, de

---

[65] Chamberlain v. Delgado, 82 D.P.R. 6, 18-19 (1960).

[66] Pueblo v. Rosario González, 80 D.P.R. 318, 328 (1958).

la Constitución que nos une en una identidad común, la mera contabilización de quién tiene más votos en un momento particular se torna en infinitamente insuficiente y en síntoma innegable de una falta de madurez democrática e institucional.[67] Nuestra Constitución "representa, en ese sentido, una llamada al consenso".[68]

Nuestro ordenamiento constitucional reconoce la importancia del consenso para las decisiones trascendentales que tendrán un impacto duradero en nuestra vida colectiva. La Constitución exige consenso para un sinnúmero de decisiones.[69]

---

[67] Son aleccionadoras las palabras del profesor Luis Rafael Rivera Rivera cuando nos dice:

> Se insiste en que este movimiento requiere sólo la mayoría simple de los miembros del Tribunal. Quienes así piensan pierden de perspectiva que el principio mayoritario, en lugar de la regla de la unanimidad, tiene sentido cuando las decisiones deben tomarse rápidamente, no cuan-do son el producto de la reflexión pausada. En realidad, más que unanimidad, exigen consenso; algo que no se limita a una mera votación, sino que presupone un acuerdo que nace de un ejercicio sincero de buena fe y responsabilidad. Buena fe acerca de las intenciones que se buscan. Responsabilidad porque las partes se obligan a lograr un fin compartido.

L. R. Rivera Rivera, *supra*, nota 3.

[68] Hernández Agosto v. López Nieves, 114 D.P.R. 601, 621 (1983, Opinión del Tribunal emitida por el Juez Presidente Trías Monge).

[69] Ejemplo de esto es el nombramiento de jefes de agencia e integrantes de la Judicatura. Artículo IV, Sección 5 y Artículo V, Sección 8, Const. P.R. De igual forma, la Constitución aborrece el Parlamento sin oposición, garantizándole a las minorías al menos una tercera parte de los escaños legislativos. Artículo III, Sección 7, Const. P.R. Lo que es más, tras garantizarle a la minoría una tercera parte de las cámaras legislativas, la Constitución exige una votación que necesariamente necesita del apoyo de esa minoría para superar el veto del Ejecutivo, para expulsar a un representante o senador, para llevar a cabo un

(continúa...)

Es decir, no obstante el mandato electoral, para aquellos asuntos que son de trascendencia e impacto duradero, la Constitución exige cooperación y consenso: no los confía a las mayorías coyunturales que a veces caen en la irresistible tentación de abusar de su poder pasajero. Incluso en el campo de la contienda electoral, el consenso es un principio que, colectivamente, hemos reconocido como esencial.[70]

El consenso institucional para las decisiones de vital importancia en el orden constitucional parte de una premisa que no se apoya en la colaboración coaccionada. Por el contrario, se fundamenta en un entendimiento que ha estado presente desde nuestra génesis constitucional y que no se basa únicamente en una orden de nuestra Ley Suprema, sino en un reconocimiento de que las decisiones de trascendencia histórica nos afectan a todos y todas por igual.

IV.

Modificar sin justificación la composición de un Tribunal Supremo como el nuestro, cuyos miembros son nombrados, no

_____

residenciamiento o para proponer enmiendas a la Constitución. Artículo III, Secciones 19, 9 y 21; Artículo VII, sección 1, Const. P.R., respectivamente.

[70] A modo de ejemplo, la Ley Electoral de Puerto Rico requiere unanimidad entre los partidos políticos para un sinnúmero de decisiones. Ley Electoral de Puerto Rico, 16 L.P.R.A. §§ 3001 y *ss*. Ese requisito de unanimidad es producto del reconocimiento de que, para que un proceso electoral tenga legitimidad, su conducción debe ser el resultado del acuerdo de todas las partes en la contienda. Una mera mayoría quebrantaría irremediablemente la confianza del Pueblo en el proceso electoral. Las demás instituciones no estamos exentas de ese riesgo y, por tanto, de esa responsabilidad.

electos, es un curso de acción que invita a la inestabilidad de las instituciones. Por ejemplo, cuando se estudia la historia del Tribunal Supremo de los Estados Unidos, más allá del frustrado "Court Packing Plan" de 1937, es notable que los momentos de mayor debilidad, falta de credibilidad y politización de ese cuerpo coincidieran, no casualmente, con las mayores modificaciones en el número de sus integrantes. Durante el periodo de la Reconstrucción tras la Guerra Civil, la lucha de poder político invadió al Tribunal Supremo de los Estados Unidos, lo que se manifestó, según Friedman, en la constante manipulación del tamaño del Tribunal durante esa época.[71] Es decir, lo que Friedman llamó una corte política se asocia con la visión de que el Tribunal Supremo debe moverse en sintonía con la marea política del momento y que su composición numérica es fácilmente manipulable.

La Resolución a la cual nos oponemos provee, como razón para el aumento de siete a nueve jueces, una supuesta congestión de casos sin atender.[72] Reclama el remedio sin demostrar el mal, pues los datos en los que se apoya son fallidos. Pero aunque no lo fueran, el remedio propuesto está totalmente desacreditado en los círculos jurídicos.

El argumento de la congestión del calendario del Tribunal debe tomarse con mucha cautela por su potencial uso como canto

---

[71] Barry Friedman, The History of the Countermajoritarian Difficulty, Part II: Reconstruction's Political Court, 91 Georgetown L. Rev. 1, 3 (2002).

[72] Véase Resolución, In re: Solicitud para aumentar el número de jueces en el Tribunal Supremo (2010).

de sirena. Un vistazo a cómo las jurisdicciones de los Estados Unidos han atendido este asunto demuestra que no hay tal cosa como una causa y efecto entre congestión y tamaño del tribunal. Los estudios y discusiones en los Estados Unidos en cuanto a la carga de los tribunales estatales no apoyan la conclusión a la que, sin fundamento empírico, llega la Mayoría.[73] Por eso, entre otras razones, es que no ha habido una cultura de cambio en la composición de los tribunales supremos de los estados de los Estados Unidos.

La incongruencia entre el alegado problema de congestión y el remedio ofrecido es aun más preocupante cuando se toma en consideración la velocidad con la que se pretende despachar un asunto de tanta envergadura. *En esta ocasión, no estamos ante*

---

[73] *Véase* F. Breen, Solutions for Appellate Court Congestion, 47 American Jurisprudence Society 228, 229 (1964); R. Kagan y otros, The Evolution of State Supreme Courts, 76 Michigan L. Rev. 961 (1978). Las estadísticas citadas por la Mayoría, en la página 17 de su Resolución, tal y como se utilizan, inducen al error. En primer lugar, la supuesta eficiencia cuantitativa de los tribunales de nueve jueces no surge de su número total, sino de su operación en salas. Como hemos visto, la operación en salas, si bien puede ser eficiente cuantitativamente, empobrece cualitativamente el trabajo del Tribunal. Regresar al sistema de salas haría que nuestra labor se asemeje más al trabajo del Tribunal de Apelaciones y menos a lo que se supone que seamos, es decir, el tribunal de última instancia. En segundo lugar, la conclusión forzosa de las estadísticas citadas es que, si no se utiliza el sistema de salas, un tribunal de nueve integrantes no tiene por qué ser más eficiente que uno de siete. Las estadísticas apuntan más a una eficiencia producto del trabajo en salas y no de un aumento de jueces. En cuanto a esto, nada impide que un tribunal de siete jueces opere en salas, si eso es lo que se quiere. Pero, como surge del Informe del Comité para el Estudio y la Evaluación del Sistema Judicial de 1965, las ventajas del sistema de salas no justifican su uso y se deben utilizar otras alternativas para atender la congestión del calendario, cuando la haya. Comité para el Estudio y la Evaluación del Sistema Judicial, supra, a las págs. 4-5.

*un asunto de tal urgencia en términos de tiempo que nos exija sacrificar la deliberación y ponderación que una decisión de esta envergadura requiere o que justifique una mera contabilización de votos, sin más.*

V.

Hoy los perdedores son claros: este Tribunal como institución y la confianza depositada en nosotros como entes imparciales.[74] Al acordarse la Resolución que hoy se aprueba por algunos de los jueces y juezas de este Tribunal, sin participación de los demás, se destruye el concepto de un Tribunal colegiado. No se cumple con este principio al otorgar, como si fuera una concesión o dádiva, cuatro escasos días para estudiar, analizar, investigar, ponderar y expresar nuestro parecer sobre la decisión monumental que se pretende tomar. Sin dudas, dista mucho del llamado que hiciera el Senador Reyes Delgado cuando hizo énfasis en la importancia de que este Tribunal tome decisiones producto de la reflexión y la deliberación.[75] Es aun más contradictorio cuando se plantea que una de las razones para incrementar el número de integrantes de este Tribunal es para que tengamos más tiempo para el análisis de los casos.

---

[74] Vienen a mente las palabras del Juez Asociado Stevens en su disidencia en Bush v. Gore, 531 U.S. 98, 129 (2000). "[T]he identity of the loser is perfectly clear. It is the Nation's confidence in the judge as an impartial guardian of the rule of law".

[75] *Véase* nota número 9.

El Tribunal Supremo no es la suma de, hasta ahora, siete jueces y juezas. Es un solo Tribunal. Es una "corte", en el sentido de que, más que un determinado grupo de jueces y juezas, es "un propósito, una visión que informa el descargo de la encomienda pública que recibe el Tribunal".[76] A medida que un grupo de jueces y juezas a su interior actúe a espaldas de los otros, destruimos la confianza del Pueblo en su más alto foro judicial como institución ajena al vaivén partidista y al juego de poder. Pobre de nuestro País cuando el debilitamiento de nuestras instituciones y la falta de confianza de nuestro Pueblo en ellas son producto de las acciones de aquellas personas encargadas de su tutela y protección.

VI.

El lunes en la tarde llegó a mi oficina un sobre sellado y rotulado como "confidencial". Éste contenía copia de una Resolución y un corto memorando de trámite que informaba que, de obtener la mayoría, se procedería a certificar la resolución el viernes siguiente, es decir, hoy.[77] No habían transcurrido dos horas cuando ya estaban también en mi oficina tres sobres confidenciales, cada uno con el timbre de los jueces que, con el cuarto, componen la Mayoría. En cada sobre

---

[76] A. García Padilla & J. J. Álvarez González, <u>El Tribunal Supremo de Puerto Rico: La Corte Pons</u>, 59 Rev. Jur. UPR 185, 186 n. 5 (1990).

[77] Se invocó la Regla 50 del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. XXI-A, para acortar los términos.

había un escueto memorando del juez o jueza informando su conformidad con lo propuesto en la Resolución.

No estoy diciendo que mis compañeros jueces y compañeras juezas no deliberaron antes de tomar esa decisión. Estoy segura que le dieron mucho pensamiento, pues no es una decisión sencilla o rutinaria. Pero esa deliberación tuvo lugar estrictamente entre ellos. Lo que no hubo fue la deliberación del Tribunal Supremo.

Como miembros de un tribunal colegiado, se supone que podamos discutir los asuntos planteados. Es más, como mínimo, se supone que esos asuntos se planteen a todas y todos los que componemos el Tribunal *antes* de que se tome la decisión final. Eso no fue lo que sucedió aquí. Aquí no hubo diálogo. Aquí no hubo intento de colegiar. Aquí lo que hubo fue el anuncio de un *fait accompli*, un aviso de lo que ya se había decidido, junto a la concesión de cuatro escasos días para que los demás pudiéramos expresarnos.

No hay decisión, y mucho menos *petición*, del Tribunal Supremo cuando tres de sus jueces advienen en conocimiento de ello prácticamente a la misma vez que el resto del País.

Por todo lo antes expuesto, con mucho pesar, disiento.


Liana Fiol Matta
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Asunto:

Solicitud a la Asamblea
Legislativa sobre
aumento en el número de
Jueces del Tribunal
Supremo

RE-2010-01

Opinión disidente emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 5 de noviembre de 2010

"¿Se ha empaquetado o no está empaquetado?"

Leopoldo Figueroa Carreras
Delegado a la Convención Constituyente

¡Qué lástima! Este Tribunal como foro de última instancia, donde se atienden los asuntos más acuciantes que aquejan al país, debía ser un recinto para la discusión serena, abierta, ejemplarizante, racional, imparcial y equilibrada, y sin ataduras de clase alguna. Especialmente, cuando la discusión afecta directamente el desempeño y funcionamiento del propio Tribunal.

Castán nos recuerda que "[e]s obvio . . . que no basta que se proclame en una Constitución escrita el principio de separación de poderes o la autonomía del Poder judicial para que un país tenga auténticas libertades y para que sus jueces gocen de efectiva independencia".[78] Se necesita para su garantía eficaz, de hombres y mujeres valientes, indoblegables ante intereses, entidades o propósitos que resulten extraños al fin mismo de la Justicia, y que tengan capacidad de acción. Se necesita, al fin y a la postre, de jueces y juezas que sepan encontrar en la Constitución, las leyes y los postulados fundamentales de Justicia, la respuesta a cualquier controversia o asunto ante su consideración y no, en el vaivén de las olas. ¡Esto es lo que todos hemos perdido hoy!

Porque creo profundamente en lo anterior y porque respeto lo que ha representado esta Institución para la vida democrática de nuestro país, no puedo, en conciencia, avalar con mi voto el asalto que perpetra una exigua mayoría de este Foro a la Institución que juraron defender contra todo enemigo interno o externo. Sabemos quién pierde. Pierde la confianza de nuestros conciudadanos en la judicatura como guardián imparcial del Estado de Derecho.[79] La aceptabilidad de la ciudadanía de nuestros dictámenes y de nuestra propia

---

[78] José Castán Tobeñas, *Poder Judicial e Independencia Judicial*, Ed. Reus, Madrid, 1951, pág. 41.

[79] Parafraseo así, lo expresado por el Juez Asociado Stevens en su opinión disidente en *Bush v. Gore*, 531 U.S. 98, 129 (2000).

legitimidad, sólo es posible en la medida en que ésta confíe en nuestra imparcialidad.

La historia se encargará de pasar juicio y adjudicar responsabilidades sobre los integrantes del "nuevo" Tribunal. "Nos atrevemos a pronosticar que el dictamen no será muy elogioso y favorable a menos que prontamente se realice que el compromiso que se contrajo al juramentar el cargo lo fue únicamente con la justicia, la verdad y lo que es correcto en derecho." *Berberena v. Echegoyen*, 128 D.P.R. 864, 930 (1991) (Rebollo López, J., op. disidente).

I

Hoy nuestro Tribunal Supremo, es decir, la entidad que perdura y no los integrantes que lo componen temporera y accidentalmente, sufre una afrenta sin precedentes. Se utiliza el mecanismo extraordinario provisto en la Sección 3 del Artículo V de la Constitución del Estado Libre Asociado de Puerto Rico para aumentar el número de miembros de este Tribunal, sin que este asunto se haya mencionado y mucho menos discutido o deliberado en el Pleno del Tribunal por todos los jueces que componen su plantilla.

En otras palabras, los miembros que avalan esta Resolución nunca antes habían planteado la necesidad de buscar mecanismos para atender la alegada "pesada carga", que se intima, pesa sobre nosotros y sobre la administración de la justicia en el país. El contenido de la Resolución que se certifica hoy no se discutió antes de circularse, como tampoco después. El entrelínea de la Resolución y el proceder de los miembros del "nuevo" Tribunal, parece sugerir

que ello es innecesario pues cuatro es más que tres. Es decir, prima en este Foro no el Imperio de la Ley, sino el Imperio del Poder.

Esta forma de actuar, a oscuras y en tinieblas, a espaldas del seno del Tribunal y escuchando sólo las propias voces y acallando la contraria, deslegitimiza la Resolución que hoy se certifica. ¿Es éste el prototipo de juez al que aspiramos los puertorriqueños?[80] ¿Es ésta la forma más idónea de resolver las controversias, escuchando sólo una parte, la que piensa igual que yo? ¿Qué puede esperar el ciudadano común que tiene una queja legítima frente al gobierno? ¿A qué obedece la ausencia de discusión abierta, franca y libre? ¿Por qué se rehúye poner sobre la mesa la realidad del trabajo pendiente ante esta Curia? ¿A qué se le teme? ¿A que aflore la verdad? ¿Es que la verdad resulta inconveniente para los designios de la mayoría?[81]

El proceder mayoritario no tan sólo es contrario a las normas más elementales de urbanidad, sino que da al traste con uno de los presupuestos o imperativos de cualquier foro colegiado y por lo tanto de la justicia apelativa, a saber: que las determinaciones que se toman son el resultado del

---

[80] *Véase,* con detenimiento y preocupación, Ingo Müller, *Los Juristas del Horror, La "Justicia" de Hitler: El pasado que Alemania no puede dejar atrás*, Ed. ABC Ltda., Bogotá, 2005.

[81] Este proceder ya ha generado desgaste en la percepción pública puertorriqueña sobre nuestra legitimidad como foro independiente. El profesor Hiram Meléndez Juarbe comenta: "[H]oy la Rama Judicial se gradúa como una rama política, como todas las demás, y pierde irreparablemente la confianza pública necesaria para fungir como el garante de derechos y árbitro imparcial de controversias sociales y políticas." Hiram Meléndez Juarbe, Dos más, www.derechoalderecho.org (última visita 3 de noviembre de 2010).

trabajo colaborativo y colegiado, luego de una ponderación individual.[82] La falta de respeto hacía esta Institución y hacia el país que trasluce de este proceder, pone de manifiesto ya el hecho de que no tan sólo es la Democracia puertorriqueña la que marcha por "desolado y escarpado camino", sino que a ésta se le ha unido el Tribunal Supremo es decir, el Poder Judicial. *Suárez Cáceres v. Comisión Estatal de Elecciones,* res. 9 de junio de 2009, 179 D.P.R. ___, 2009 TSPR 97 (Rodríguez Rodríguez, J. op. disidente).

II

En su Resolución, los miembros del "nuevo" Tribunal --cuya experiencia combinada en este Tribunal no llega a un lustro-- aseveran que el aumento en el número de jueces es necesario para paliar un supuesto atraso en los trabajos del Tribunal y se propone, como mecanismo para facilitar su funcionamiento, que éste se opere en salas.[83]

El Juez Presidente señor Hernández Denton, en su opinión disidente, ha desmantelado la falacia sobre la cual se asienta la petición que le hacen cuatro miembros de esta Curia a la Asamblea Legislativa y al Gobernador, el alegado atraso. El "atraso" es, como vimos, autoinfligido. No creo necesario entonces, abordar este aspecto de la Resolución que hoy se aprueba. Me habré de referir a otros asuntos que se plantean en esta petición.

---

[82] *Véase*, Paul Carrington, Daniel Meador, Maurice Rosenberg, The Imperatives of Appellate Justice en *Justice on Appeal*, 1976, págs. 7-12.
[83] Se arguye también que este aumento supone una mayor transparencia en los asuntos del Tribunal. Poco pueden predicar sobre transparencias quienes actúan en la noche.

Considero conveniente comenzar repasando someramente cuál ha sido la composición del Tribunal a través de su historia. Ello nos permitirá ubicar en su justa perspectiva el alcance de la determinación que hoy adoptan cuatro miembros del "nuevo" Tribunal.

En el año 1898, al cambio de soberanía, la Audiencia Territorial de Puerto Rico, precursora del Tribunal Supremo, estaba compuesta por siete magistrados incluyendo su presidente. *Véanse* José Trías Monge, *El Sistema Judicial de Puerto Rico*, Editorial Universidad de Puerto Rico, Río Piedras, 1979, pág. 48; Luis Rafael Rivera, *La Justicia en sus Manos: Historia del Tribunal Supremo de Puerto Rico*, Editorial Santillana, San Juan, 2007, pág. 32. En octubre de 1898, el general Brooks, primer gobernador militar en la Isla, abolió el Tribunal de lo Contencioso Administrativo y dispuso que sus deberes y funciones se transfirieran a la Corte Suprema de Justicia.

De esta forma se creó un Tribunal Supremo "a imagen y semejanza de los conocidos en los estados federados, aunque sin alterar por el momento su naturaleza de corte de casación." Rivera, *op. cit.*, pág. 39. Véase además, Carmelo Delgado Cintrón, *Derecho y colonialismo*, Editorial Edil, Río Piedras, 1988, pág. 156, n. 24. En diciembre de ese año, el general Brooks fijó en siete jueces la composición del Tribunal Supremo. Un año más tarde, el general Davis emitió una nueva orden general disminuyendo a cinco el número de magistrados que componían el Tribunal Supremo. Rivera, *op. cit.*, pág. 50.

El número de jueces del Tribunal permaneció inalterado durante la primera mitad del Siglo XX. Ello así, no obstante varias solicitudes del propio Tribunal, incluyendo una petición ante un subcomité del Comité de lo Judicial del Senado de los Estados Unidos, para que se aumentara el número de sus miembros a siete, por ser éste, el número más idóneo para operar. José Trías Monge, *La Estructura del Poder Judicial en la Constitución de Puerto Rico*, 46 Rev. Jur. U.P.R. 611, 623 (1977); *Resolución del Tribunal de 26 de julio de 1952*.

Con la aprobación en el Congreso de Estados Unidos de la Ley de Constitución y Convenio de 1950, mejor conocida como la Ley 600, comenzó el proceso que llevaría al pueblo de Puerto Rico a aprobar su Constitución en una Asamblea Constituyente. En ésta se dejó establecido la forma el actual sistema judicial en Puerto Rico. La Comisión de la Rama Judicial ante la Convención Constituyente tuvo ante sí diversas propuestas para la estructuración del poder judicial. El consenso general era que se debía fijar el número de jueces en siete. Trías Monge, *El Sistema . . ., op. cit.*, pág. 119. Trías Monge nos señala que en el seno de la Convención Constituyente, "[t]anto el sector socialista como los sectores republicanos favorecían un Tribunal Supremo compuesto de siete jueces." *Íbid*, pág. 118.

Ante la Comisión de la Rama Judicial de la Convención Constituyente "comparecieron los abogados de Puerto Rico por su comisión del Colegio de Abogados, los jueces de distrito de la isla por la asociación que ellos tienen constituida, y

varios jueces del Tribunal Supremo, y todos ellos estuvieron unánimes, en que el Tribunal Supremo debe estar integrado por un juez presidente y seis jueces asociados". 1 *Diario de Sesiones de la Convención Constituyente de Puerto Rico*, pág. 519 (1961). El propio Juez Presidente de aquel entonces, don Roberto H. Todd, se expresó a nombre del Pleno del Tribunal en ese mismo sentido. José Trías Monge, *Historia Constitucional de Puerto Rico*, Editorial Universidad de Puerto Rico, Río Piedras, 1982, pág. 91. Finalmente, la Escuela de Administración Pública en su informe recomendó que se fijara el número de jueces en siete, pues este número, lejos de ser novedoso, era el criterio que predominaba en la jurisdicción estatal norteamericana. *La Nueva Constitución de Puerto Rico*, pág. 465 (2005).

A pesar del consenso existente sobre cómo debería estar conformada la plantilla del Tribunal, la Convención Constituyente determinó que este cuerpo estaría compuesto por un Juez Presidente y cuatro Jueces Asociados, que como hemos visto, era su configuración en ese momento. ¿Por qué la Convención Constituyente desoyó lo que era una propuesta que gozaba de amplio respaldo en la comunidad jurídica y no fijó en siete la composición del Tribunal, optando por dejarlo en cinco y proveyendo en vez un mecanismo que permitiese que fueran éstos quienes solicitaran el aumento a siete? La respuesta es sencilla: **Por respeto a la independencia judicial.** La mayoría de los Constituyentes entendía que no se debía dar la impresión de que personas ajenas al Poder Judicial, los políticos, imponían su criterio sobre cómo

debía quedar configurado el más Alto Foro Judicial. Es por ello que se optó por mantener el mismo número de jueces que en ese entonces lo componían, cinco, y establecer un mecanismo para que fuesen los propios jueces quienes solicitaran modificar su composición, lo que pasó a ser la Sección 3 del Artículo V de la Constitución. Trías Monge, La Estructura del Poder Judicial …, *op. cit.*, *pág.* 625.

Don Jaime Benítez, con la claridad que le caracterizaba explicaba: "Hay una cierta germanidad en todo este capítulo [el Artículo V de la Constitución] porque estamos hablando de un concepto básico que es el concepto básico de la independencia judicial y de la responsabilidad política frente a esa independencia judicial…. Quiero decir también en este mismo punto, … que esta disposición de que no podrá variarse el número de los jueces a menos que éstos lo soliciten, es una prueba clara del deseo de evidenciar, hasta el último extremo, **la indisposición mayoritaria para intervenir con el poder judicial**." 1 *Diario de Sesiones*, pág. 525. (Énfasis nuestro.)

En otras palabras, la disposición que hoy invocan los cuatro miembros del "nuevo" Tribunal para aumentar la plantilla de este Tribunal --Sección 3 del Artículo V de la Constitución- se aprobó con el fin de impedir que las otras dos Ramas de gobierno pudieran entrometerse en las labores de la Rama Judicial, contaminando así el pensamiento crítico e independiente que tiene que reinar en esta Curia. Al sostener la necesidad de la referida cláusula, don Ernesto Ramos Antonini expresó que:

> . . . s[í] es muy grave que ese poder judicial pueda estar sujeto a las maquinaciones del Ejecutivo o del poder legislativo, que puedan en un momento dado, perdonen el uso de la palabra, "empaquetar" al Tribunal Supremo, que es el más alto tribunal de última instancia en Puerto Rico. Y el pueblo nos dijo que quería que ahí hubiera en la constitución una cláusula mediante la cual el poder judicial no pudiera ser "empaquetado" en ningún momento de su historia por razones políticas, o beneficios de cualquiera otra clase, que pudiera poner en peligro las garantías consignadas en la propia constitución. Y si el pueblo, al aprobar esa cláusula que impide la "empaquetadura" del poder judicial, así nos instruye para su seguridad y su garantía, **nosotros les decimos a ustedes que en eso no podemos ceder porque eso es un mandato de carácter grave, en que el pueblo quiere estar protegido contra toda "empaquetadura" del poder judicial.**

*Diario de Sesiones*, *supra*, pág. 552 (Énfasis nuestro).

El entonces delegado, don Luis A. Ferré, también mostró su apoyo a la inclusión de la disposición diciendo que "[t]ambién creía que esto era una salvaguardia para evitar que, en connivencia con el ejecutivo, pueda el poder legislativo variar el poder judicial por cuestiones de política partidista, para beneficio del partido que estuviera en el poder en ese momento, **ya que el mismo Tribunal Supremo no iba a presentar un aumento en sus jueces para variar la función del poder de ese tribunal, ya que esto es una cosa incompatible**". *Id.*, pág. 543 (Énfasis nuestro). ¡Qué lástima que no exista en estos momentos entre los integrantes del "nuevo" Tribunal esa misma altura de miras!

Aprobada la Constitución y como se esperaba, el seno del Tribunal le solicitó de la Asamblea Legislativa unánimemente que se aumentara su composición a siete jueces. *Véanse, Resolución del Tribunal de 26 de julio de 1952*; *Ley Núm. 2 de 4 de agosto de 1952*. Fue ésa la primera vez que se utilizó

la disposición constitucional que regula la modificación del número de los jueces de este Foro. **Pero distinto a lo que ocurre ahora, ese acto fue, más que nada, un ejercicio de independencia judicial**. A partir de entonces, el Tribunal ha estado compuesto por un juez presidente y seis jueces asociados, con excepción del periodo de 1961–1975. Véase discusión, *infra*.

Recapitulando, el anterior recuento sobre la fijación del número de jueces del Tribunal Supremo en 7 pone de manifiesto sus hondas raíces históricas. No fue escogido al azar. Es el número que mejor responde a las necesidades de eficiencia y transparencia de un foro de última instancia, tal y como lo reconoce la Escuela de Administración Pública en su informe a la Convención. Por otra parte, la disposición que provee para modificar el número de jueces se aprobó por los miembros de la Convención Constituyente como un mecanismo para garantizar la independencia de la Rama Judicial de las ramas políticas de gobierno. **Difícilmente aquellos hombres y mujeres de bien, pudieran concebir como una realidad, que el empaquetamiento proviniese de adentro, de los que juraron, al vestir la toga, que serían los principales guardianes de la independencia judicial.**

III

A

En el sistema jurídico estadounidense, bajo cuyo esquema se ha basado el Artículo V de nuestra Constitución,[84] se ha

---

[84] *Véase Diario de Sesiones,* págs. 2608–2615.

considerado extensamente el asunto de cuál debe ser la composición apropiada de un tribunal apelativo, particularmente uno de última instancia. Sobre este asunto se ha señalado que una composición de 7 jueces constituye la estructura numérica más típica y satisfactoria entre los tribunales supremos estatales. *Véase* American Bar Association, *Standards Relating to Court Organization*, págs. 39-40 (1990) ("The number most common and generally satisfactory is seven."); Dept. of Justice, Bureau of Justice Statistics, *State Court Organization 2004*, pág. 7 (2006) ("The most common arrangement is a seven judge COLR [court of last resort], found in 28 states and in Puerto Rico."); Peter L. Murray, *Maine's Overburdened Law Court: Has the Time Come for a Maine Appeals Court?*, 52 Me. L. Rev. 43, 57 (2000) ("The optimal number of judges for a state supreme court is generally considered to be seven".); Gerald B. Cope, *Discretionary Review of the Decisions of Intermediate Appellate Courts: A Comparison of Florida's System with those of the other States and the Federal System*, 45 Fla. L. Rev. 21, 27 (1993) ("The most common number of justices in the state supreme courts is seven.")

Según explica la División de Administración Judicial del *American Bar Association*:

> A supreme court should be constituted of an odd number of judges, so that its decisions can be reached by majority vote. The number most common and generally satisfactory is seven. This facilitates the working relationships required to establish concurrence of opinion on difficult legal questions, while at the same time being large enough to provide breath of viewpoint and the

> personnel to prepare the opinions that are the principal work product of appellate courts.

American Bar Association, *Standards Relating to Court Organization*, pág. 39.

Consistente con este criterio, una notable mayoría de los tribunales estatales de última instancia están compuestos por 7 jueces o menos (28 estados tienen 7 jueces; 17 estados tienen 5 jueces). Únicamente 5 estados[85] siguen el modelo de 9 jueces existente en el Tribunal Supremo federal.[86] *Véase* National Center for State Courts, *State Court Statistics: An Analysis of 2007 State Court Caseloads* 92-93 (2009); Dept. of Justice, Bureau of Justice Statistics, *State Court Organization 2004*, págs. 12-14.

Vemos así, como la plantilla de este Tribunal es la plantilla típica de la mayoría de las cortes supremas estatales. Inclusive, valga señalar que estados tan poblados como California (sobre 36 millones de habitantes)[87] y Nueva York (sobre 19 millones de habitantes)[88] tienen foros de última instancia compuestos por 7 jueces aún cuando el número

---

[85] Entre estos 5 estados se encuentran Texas y Oklahoma que, a diferencia del resto de los estados, tienen un segundo foro de última instancia para asuntos criminales. En el caso de Texas, sus dos foros de última instancia están compuestos por 9 jueces. En Oklahoma, por su parte, el Tribunal Supremo tiene 9 jueces y la Corte de Apelaciones Criminales tiene 5 jueces. *Véase* National Center for State Courts, *State Court Statistics: An Analysis of 2007 State Court Caseloads* 48 & 56 (2009); Dept. of Justice, Bureau of Justice Statistics, *State Court Organization 2004*, págs. 12-14.

[86] El Tribunal Supremo federal actualmente está compuesto por 9 jueces. *Véase* 28 U.S.C. § 1. Este número se ha mantenido fijo desde 1869. *Véase* 22-401 Moore's Federal Practice – Civil sec. 401.03.

[87] *Véase*, National Center for State Courts, State Court Statistics: An Analysis of 2007 State Court Caseloads, 193.

[88] *Ibid.*

de casos presentados para ambas jurisdicciones durante el 2007 (8,984 en California y 3,770 en Nueva York) excedió por mucho los 1,276 casos que este Tribunal recibió durante el año fiscal 2006-2007.

Por otro lado, las 5 jurisdicciones estatales (Texas, Washington, Alabama, Oklahoma y Mississippi) que no siguen la composición típica de 7 jueces, o menos, prevaleciente en el 90% de los estados (45 de 50) difieren marcadamente de Puerto Rico, bien con respecto al volumen de casos presentados, el tamaño de la población que atienden, o el sistema de revisión apelativa existente.[89]

Valga aclarar aquí y ahora, brevemente, lo siguiente: La mayoría hace referencia en su Resolución a un estudio que alegadamente justifica los cambios propuestos en la plantilla del Tribunal, invocando la experiencia de Mississippi. *Véase* Resolución pág. 17. Lo cierto es que la mayoría citó aisladamente una oración en la que se discute una investigación cuantitativa sobre la capacidad de producción de los tribunales de última instancia estatales en relación con el número de jueces que los componen. *Véase* V.E. Flango, State Supreme Courts Opinions as Law Development, 11 J. App. Prac. & Process 105 (2010). Sin embargo, la mayoría obvió mencionar al editar el texto, una de las ideas centrales del artículo. Hace más de treinta años, un grupo de académicos concluyó que publicar un gran número de opiniones sin la debida deliberación es nocivo para el desarrollo del Derecho,

---

[89] *Ibid.*

ya que tal proceder redunda en una merma en la calidad del contenido de las decisiones publicadas. Id., pág. 110. A esos efectos, el autor concluye que

> ". . . [I]f law development is the goal. . . . it is not appropriate to evaluate productivity in courts of last resort based upon opinion production or to rate states on number of opinions per justice, just as it would not be appropriate to evaluate state legislatures by number of bills enacted into law. The quality of the court decisions and the rationales for the decisions as documented in the opinion are the appropriate criteria. One great decision that breaks new ground, reconciles conflicts of laws, or settles an area of law is worth more than a larger number of 'routine' decisions that are justified by more or less conventional lines of reasoning."

V. E. Flango, *supra* pág. 110.

Además, el "nuevo" Tribunal omite mencionar que el sistema apelativo de Mississippi diverge sustancialmente del nuestro pues opera bajo el poco frecuente *"deflective system"* (vigente en sólo 2 estados más),[90] en el que todas las apelaciones del tribunal de primera instancia se presentan directamente en el Tribunal Supremo; quien, bajo ciertos parámetros, puede transferir casos al foro apelativo intermedio. *Véase Mississippi Rules of Appellate Procedure*,

---

[90] Para una discusión sobre el referido sistema *véase* Leslie H. Southwick, *The Mississippi Court of Appeals: History, Procedures, & First Year's Jurisprudence*, 65 Miss. L.J. 593, 615 (1996) ("The basic idea of a deflective system is that a state's highest court continues to have all appeals from trial courts filed with its clerk. Through a screening process, a decision is then made as to which cases the highest court will retain and which will be sent to the intermediate court."); National Center for State Courts, *State of Iowa Supreme Court Organizational Assessment and Workflow Review: Final Report* 1 & 7 (2008) ("Aside from Iowa, only the states of Idaho and Mississippi currently utilize a deflective system. … [In] a deflective system … all appeals are filed directly with the Supreme Court which subsequently decides whether to retain or transfer each case.").

Rule 16 ("All appeals from final orders of trial courts shall be filed in the Supreme Court and the Supreme Court shall assign cases, as appropriate, to the Court of Appeals."). Ello a diferencia de este Tribunal, que considera los casos presentados con el beneficio de una discusión colegiada previa por parte del Tribunal de Apelaciones que facilita la disposición de los recursos.[91] El "nuevo" Tribunal opta así por comparar las chinas con la parcha, una dulce y agradable y la otra, como sabemos, amarga.

B

El constitucionalista, profesor José Julián Álvarez, nos indica: "[L]os estudios que existen sobre este tema en Estados Unidos y en Puerto Rico demuestran que el aumento en la composición de un tribunal colegiado puede significar más atraso[.]" José Julián Álvarez González, *La Nueva Ley de la Judicatura y la Competencia Obligatoria del Tribunal Supremo: Algunas Jorobas de un Solo Camello*, 65 Rev. Jur. U.P.R. 1, 29 n.177 (1996). Esto pues, aunque "un aumento en el número de jueces podría significar más plumas a las que se pueden asignar la redacción de decisiones … también significa más

---

[91] Sobre las desventajas de un *"deflective system" véase* W. William Leaphart, 25 Montana Lawyer 5 (2000) ("[In] a deflective system [the] Supreme Court must screen all cases that come before it and determine which cases it will keep and which cases to send or 'deflect' to the IAC [Intermediate Appellate Court]. In our view, the screening process is counterproductive. That is, it would require us to spend a considerable portion of our time screening which cases to send to the IAC -- time we could just as easily spend deciding the cases in the first instance. Unless we were to delegate the screening process to staff attorneys (an unacceptable alternative in our view) the deflective model does not appear to be an efficient use of court or staff time.").

mentes que tendrían que consultarse sobre qué decidir y cómo decidirlo, lo que en ocasiones puede retrasar aún más el proceso decisional." Antonio R. García Padilla y José Julián Álvarez González, *El Tribunal Supremo de Puerto Rico: La Corte Pons*, 59 Rev. Jur. U.P.R. 185, 226 n.121 (1990).

En este sentido, la División de Administración Judicial del *American Bar Association* ha comentado que incorporar jueces adicionales incluso podría afectar la función de un Tribunal Supremo. *Véase* American Bar Association, *Standards Relating to Court Organization*, pág. 40 ("Adding judges to a highest court may actually slow down its operation rather than speed it up.").

Así lo articuló el propio Juez Presidente del Tribunal Supremo federal, Charles Evans Hughes, en momentos en que el presidente Franklin D. Roosevelt impulsaba el *Court-packing plan* para apoderarse del Tribunal Supremo federal por virtud de un aumento en su composición. En dicha ocasión, y como respuesta al argumento de que el retraso en el calendario del Tribunal Supremo federal requería aumentar el número de sus jueces, el Juez Presidente Hughes, con el apoyo de los Jueces Asociados Van Devanter y Brandeis, expresó:

> An increase in the number of Justices of the Supreme Court, apart from any question of policy, which I do not discuss, would not promote the efficiency of the Court. It is believed that it would impair that efficiency so long as the Court acts as a unit. There would be more judges to hear, more judges to confer, more judges to discuss, more judges to be convinced and to deride.

Carta del Juez Presidente Charles Evans Hughes al senador Burton K. Wheeler (1937), *reproducida en* Gunther & Sullivan, *Constitutional Law* 184 (13th ed. 1997).

Los anteriores fundamentos llevaron al *National Center of State Courts* a no recomendar un aumento de 7 a 9 jueces en el Tribunal Supremo de Nebraska como solución al problema de congestión en el calendario de dicho foro que se le había encomendado estudiar. *Véase* National Center of State Courts, *The Nebraska Appellate System: A Review* 28 (1989). En torno a este asunto explicó:

> The decision-making process itself also would be affected by the addition of more judges. The process of reaching a decision in conference would be extended by the participation of the additional justices. Likewise, the process of obtaining a majority of the court in support of an opinion expressing the majority viewpoint would become more involved and time-consuming than with the present number of judges. And the fragile ingredient of collegiality would at least be diluted if not dispelled.

*The Nebraska Appellate System* 24-25.

Igual visión han expresado distintos jueces apelativos federales, quienes han resaltado las deficiencias de incorporar jueces adicionales a un tribunal apelativo colegiado como remedio a la congestión de casos. *Véase* Harry T. Edwards, *The Rising Work Load and Perceived "Bureaucracy" of the Federal Courts: A Causation-Based Approach to the Search for Appropriate Remedies*, 68 Iowa L. Rev. 871, 919 (1983) ("the impediments to collegiality that stem from the sheer number of members of the court reduce the overall quality of the court's work product."); Irving R. Kaufman, *New Remedies For The Next Century Of Judicial Reform: Time As The Greatest Innovator*, 57 Fordham L. Rev. 253, 257 (1988) ("Additional judgeships are both an inefficient use of scant judicial resources and a disruptive influence on the development of the law.").

Sobre el particular, el juez Gerald Bard Tjoflat, de la Corte de Apelaciones de Estados Unidos para el Undécimo Circuito, señaló:

> Bigger is not always better. … As the number of judges on an appellate court increases, the court evolves into what I call a 'jumbo court.' [T]he dynamics of a jumbo court are such that, as the court grows larger, the productivity of individual judges on the court declines. … [E]ach addition undermines collegiality and reduces the efficiency of the court as a whole. … Because large courts inevitably lose collegiality and efficiency in resolving disputes, productivity of all members of the court will decline, and, consequently, the contribution of each new judge is overstated. … Anyone who has sat en banc on a jumbo court will tell you that it is an unpleasant, tiring and largely futile experience.

Gerald Bard Tjoflat, *More Judges, Less Justice: The Case Against Expansion of the Federal Judiciary*, 79 A.B.A.J. 70, 70-72 (1993).

IV

Como dijimos anteriormente, los miembros del "nuevo" Tribunal proponen que se opere en sala una vez se aumente el número de jueces de nuestra plantilla. Para evaluar esta propuesta conviene, nuevamente, repasar nuestra experiencia histórica.

Para finales de la década de los años 1950's la presentación de casos ante este Tribunal experimentó un aumento significativo. Ello, entre otros factores, contribuyó a que aumentase el atraso en este Tribunal. En 1958 la Asamblea Legislativa aprobó la Ley núm. 115 de 26 de junio de 1958, para hacer discrecional la mayor parte de la jurisdicción apelativa del Tribunal Supremo y limitar la

jurisdicción original de este Tribunal, como mecanismo para solventar la acumulación de casos ante este Tribunal.

Ello no obstante, y como nos recuerda Trías Monge, "[l]as medidas tomadas no aparecieron suficientes para conjurar el problema de congestión en los calendarios del Tribunal Supremo, con la resultante demora en la decisión de los casos en su fase apelativa, por lo que se procedió a enmendar la sección 4 del artículo V de la Constitución para facilitar aún más el funcionamiento en salas del Tribunal Supremo." Trías Monge, *El Sistema Judicial…*, *op. cit.*, pág. 146. Esta enmienda viabilizó que, al elevarse el número de jueces a 9, al año siguiente, se pudieran crear "hasta tres salas del Tribunal Supremo en momentos de necesidad." *Íbid*.

No cabe duda que cuando se presentó la propuesta del funcionamiento en salas en 1960, tuvo buena acogida por parte de la comunidad jurídica. Así se demostró en la vista pública de 20 de mayo de 1960, para considerar la Resolución Concurrente del Senado Núm. 32: "Para proponer una enmienda a la Sección 4 del Artículo V de la Constitución del Estado Libre Asociado de Puerto Rico: Funcionamiento del Tribunal Supremo." Figuras prominentes, entre ellos el licenciado José Trías Monge y el Dr. Santos P. Amadeo, apoyaron la medida por considerarla una herramienta necesaria para enfrentar la situación de aquel momento.

El apoyo a esta enmienda a la Constitución, sin embargo, no fue unánime. El licenciado Francisco Ponsa Feliú compareció a la Legislatura a oponerse a la enmienda constitucional. En una ponencia preclara adelantó lo que

ocurriría de operarse en salas. Explicó que al operar en salas se "sacrifica[ban] otros principios y otras nociones que son tan importantes por lo menos, si no más, que el problema de la congestión". Vista Pública, Res. Conc. S. 32, pág. 13. Específicamente señaló, que el funcionamiento en salas viabilizaba que los derechos individuales de las personas se decidieran por el voto del exiguo número de dos jueces, además de la amenaza que ello suponía para la estabilidad del régimen jurídico. *Id.*, págs. 14-15. Esto último, como resultado de que las decisiones emitidas por salas le restarían fuerza a la doctrina establecida, ante la probabilidad de que otra sala, enfrentándose a unos hechos similares, produzca un resultado distinto si no compartía el mismo criterio de la primera sala. La certeza de nuestro dictámenes, presupuesto imprescindible para la impartición de la justicia, cae rendida ante el sistema que hoy se glorifica.

Una vez implementado el sistema de las salas, inicialmente se redujo el atraso en los casos pendientes de resolución ante el Tribunal Supremo. Con el tiempo los "beneficios" ganados no compensaban el perjuicio que produjo el uso de las salas. Para empezar, el atraso regresó. Trías, que vivió esa época, nos señala lo siguiente: "Lo que existió por mucho tiempo fue una sucesión de opiniones sueltas no representativas del criterio del cuerpo. . . . No había gran evidencia de que las opiniones publicadas habían sido objeto de consideración a fondo por más de un magistrado." Trías Monge, *Cómo fue . . ., op. cit.*, pág.

264.     Tan es así, que describe la experiencia con **"el sistema desprestigiado de salas"** como **aciaga**, pues el Tribunal durante esta época **"perdió su coherencia."** Trías Monge, *Cómo fue . . .*, *op. cit.*, pág. 264-265. (Énfasis nuestro.)

Así, "[u]na década después nadie se [mostró] satisfecho ni orgulloso de los resultados obtenidos. Resurge la crisis del abarrotamiento de casos . . . . Incluso, dos salas resuelven el mismo punto de derecho de distinta manera. El modelo ideado para dispensar mejor la justicia ya no deslumbra y llega a decepcionar hasta a aquellos quienes originalmente apoyaban la idea de las salas." Rivera, *op. cit.*, pág. 191. Quienes tuvieron el beneficio de observar de cerca el funcionamiento de las salas, recomiendan no mirar al pasado, sino buscar nuevas alternativas. Esta experiencia desoladora es la que quiere emular el "nuevo" Tribunal. Quien no conoce su historia habrá de incurrir en los errores del pasado.

V

No existe razón legítima alguna para que los Jueces Asociados aquí proponentes soliciten aumentar la plantilla de este Foro. Se trata de un aumento que ya se probó (y se rechazó) y que resulta particularmente innecesario ante la existencia del Tribunal de Apelaciones, el cual brinda un alivio a nuestra carga apelativa que no estuvo disponible en tiempos anteriores.

Como se recordará, el fallido experimento de aumento a 9 jueces de 1961 ocurrió en momentos en que nuestro sistema

legal carecía de un foro apelativo intermedio. Con el establecimiento de las sesiones apelativas en el Tribunal Superior en 1974 (que sirvió de antesala al regreso a un Tribunal de 7 jueces por virtud de la legislación de 1975) se pudo desarrollar el camino para subsanar este vacío con la incorporación de un Tribunal de Apelaciones que hoy en día ha madurado lo suficiente como para "permitir que [este] Tribunal … pueda tener mayor desahogo y pueda servir al máximo de agente en su función social de pautar e interpretar el derecho [así como] ayudar en la congestión de [nuestros] casos[.]" *De Jesús Viñas v. González Lugo,* 170 D.P.R. 499, 513-514 (2007); *Depto. de la Familia v. Shrivers Otero*, 145 D.P.R. 351, 356 n.2 (1998).

Según advirtió la Comisión Asesora designada por el entonces Juez Presidente señor Víctor M. Pons Núñez (en el informe que rindió en 1987 y que sirvió de base para los respectivos foros intermedios que favorecieron los entonces Gobernadores señor Rafael Hernández Colón y señor Pedro Rosselló González), un tribunal apelativo intermedio permite reducir el atraso en los calendarios de los tribunales de última instancia y facilita el ejercicio de su función rectora de la doctrina. *Véase Informe de la Comisión Asesora del Juez Presidente sobre la Estructura y Funcionamiento del Tribunal de Primera Instancia*, 48 Rev. Col. Abog. 5, 40-41 (1987).

Es por ello que el desarrollo de foros intermedios en las jurisdicciones estatales ha permitido revertir la composición aumentada de 9 jueces cada vez menos frecuente en

los tribunales de última instancia. Así ocurrió, por ejemplo, en los Tribunales Supremos de Iowa y Minnesota al ver reducida sus respectivas composiciones de 9 a 7 jueces con la ampliación o instauración de sus tribunales apelativos intermedios. *Véase* 1998 Ia. Ch. 1184; Act of Mar. 22, 1982, ch. 501, 1982 Minn. Laws 569.

Resulta, pues, realmente sorprendente que los cuatro recién nombrados compañeros Jueces Asociados tomen la dirección opuesta al sentido común y la experiencia en los estados, y promueva una petición de aumento justo ahora que contamos con la ayuda de un tribunal apelativo desarrollado que incluso es, numéricamente, superior a la inmensa mayoría de los foros apelativos intermedios estatales.

Nótese, que la Ley de la Judicatura de 2003 creó 6 plazas adicionales de jueces del Tribunal de Apelaciones, para un total de 39.[92] Con sus 39 jueces Puerto Rico excede por mucho la mediana de 15 jueces apelativos intermedios que se calcula por estado. *Véase* Dept. of Justice, Bureau of Justice Statistics, *State Court Organization, 1987-2004*, pág. 4 (2007). De hecho, 11 estados ni tan siquiera tienen un tribunal apelativo intermedio[93] y, de los 39 que sí lo tienen, Puerto Rico supera a 32 en número de jueces. *Véase*

---

[92] *Véanse* Artículos 4.003 y 8.001 de la Ley de la Judicatura de 2003, 4 L.P.R.A. §§ 24v y 25r.

[93] Se incluye en este cálculo a Dakota del Norte por no tener un foro apelativo intermedio permanente. Sobre el funcionamiento del *"Temporary Court of Appeals"* en la referida jurisdicción *véase* N.D. Cent. Code, §§ 27-02.1-01 a 27-02.1-09; N.D. Sup. Ct. Admin. Rule 27.

Dept. of Justice, Bureau of Justice Statistics, *State Court Organization 2004* a las págs. 12-14.

La petición de aumento de los Jueces proponentes es aún más difícil de entender, a la luz de parámetros jurídicos, si tomamos en cuenta que durante el año fiscal 2009 el Tribunal de Apelaciones resolvió 5,603 recursos, y que de éstos sólo 22.99% acudió en alzada antes nos. *Véase Tribunal de Apelaciones, Estadísticas 2008-2009* pág. 21. Esto implica que nuestro sistema apelativo dispuso de 4,315 recursos sin comprometer el calendario de este Tribunal. El alivio que representó el foro intermedio para nuestra carga apelativa fue similar para años anteriores[94] y se perfila aún mayor ahora que se aprobaron las nuevas Reglas de Procedimiento Civil que limitan significativamente los recursos en alzada de determinaciones interlocutorias del Tribunal de Primera Instancia. No hay, por tanto, justificación alguna para el pedido de los recién nombrado jueces.

VI

Unas reflexiones finales. Tras examinar las ya discutidas lecciones de nuestra historia, los datos que recoge el Juez Presidente señor Hernández Denton, así como los "argumentos" contenidos en la rauda Resolución del Tribunal, es forzoso concluir que la movida que hoy una mayoría del Tribunal realiza no responde a los mejores

---

[94] *Véase,* por ejemplo, *Tribunal de Apelaciones, Estadísticas 2007-2008* pág. 18; *Tribunal de Apelaciones, Estadísticas 2006-2007* pág. 19. Para periodos anteriores *véase Informe General sobre el Tribunal Apelativo Intermedio: Años Fiscales 1992-93 al 2002-03* pág. 11.

intereses de esta Institución. Por el contrario, actualmente todo indica que el número de jueces que lo integran debe permanecer inalterado. Además, y tal vez más importante, no se debe utilizar el mecanismo extraordinario de la Sección 3 del Artículo V de la Constitución, para resolver lo que son deficiencias subjetivas y no orgánicas.

La Resolución emitida por el Tribunal nos recuerda la consulta plebiscitaria que tuvo lugar en Puerto Rico durante la década de los noventa. En 1994, el Gobernador de Puerto Rico presentó un plan para reorganizar el sistema judicial del país, el cual fue objeto de serios señalamientos por parte de la academia y los diversos componentes de la comunidad jurídica en general ante sus evidentes deficiencias.[95] El referido plan fue criticado, en parte, por entender que con su implantación se pretendía utilizar la Rama Judicial como una ficha de juego más dentro de la ya lastimosa lucha política por el control absoluto de nuestras instituciones.

Ese mismo año, este Tribunal rechazó vehementemente el mencionado plan de reorganización por múltiples razones, entre éstas, por adolecer de serias deficiencias conceptuales, no estar precedido por estudios empíricos adecuados y atentar contra los principios de independencia judicial y separación de poderes. *Véase*, *In re Reforma Judicial*, 136 D.P.R. 1 (1994). De igual forma, sostuvimos

---

[95] Tan deficiente fue la Reforma del 1994, que apenas un año más tarde, hubo que reformar esa "reforma". Véase, Ley núm. 248 de 25 de diciembre de 1995.

firmemente que era innecesario variar la composición del Tribunal Supremo. A esos efectos, indicamos: "Nuestra posición debe quedar clara, al efecto de que los cambios simplemente estructurales no constituyen de por sí una solución eficaz a los problemas de la administración judicial en Puerto Rico." *Id.*, pág. 2.

A pesar de nuestra oposición y la de la gran mayoría de la comunidad jurídica, la mal llamada reforma judicial fue aprobada bajo la Ley de la Judicatura de Puerto Rico de 1994, Ley Núm. 1 de 28 de julio de 1994. Sin embargo, académicos muy respetados llegaron a sugerir que el aumento en la competencia original del Tribunal Supremo, según aprobado en la Ley de la Judicatura de 1994, no era sino un mecanismo de presión para tratar de llevar a este Tribunal a que solicitara un aumento en su composición. *Véase*, José Julián Álvarez González, *La nueva ley de la Judicatura y la competencia obligatoria del Tribunal Supremo: algunas jorobas de un solo camello*, 65 Rev. Jur. U.P.R. 1, 27-28 (1996). Sin embargo, a los proponentes de aquella gesta les restaba alcanzar un cambio que sólo la Constitución impedía.

Es por ello que a sólo tres meses desde que este Tribunal se expresara sobre lo innecesario que resultaba aumentar su composición, la administración del gobierno de ese entonces --algunos de sus miembros sentados ahora en este Tribunal-- impulsó la celebración de un referéndum en el que, entre otros asuntos, se le consultó al pueblo lo siguiente: primero, si la Constitución debía enmendarse para aumentar el número de Jueces Asociados del Tribunal Supremo a nueve, y

segundo, si se debía suprimir el texto constitucional que delega en el referido organismo la facultad exclusiva de solicitar una variación a su composición mediante ley. Ley Núm. 49 de 2 de agosto de 1994, conocida como "Ley Habilitadora del Referéndum sobre enmiendas a la Constitución de Puerto Rico de 1994". Como sabemos, la ciudadanía rechazó todas y cada una de las enmiendas incluidas en la referida consulta. No obstante, hoy la mayoría de este Tribunal revisita el tema de la composición de nuestro Foro y pretende alcanzar bajo el manto de la Constitución, aquello que no se pudo mediante el voto popular. Tal proceder es inaceptable.

¿Qué motiva entonces la solicitud de una mayoría del Tribunal a los efectos de aumentar a nueve el número de jueces de este Foro? La respuesta puede que haya sido revelada hace apenas un año: "Se trata del flujo normal de la marea judicial en una democracia, producto indirecto del mandato del Pueblo expresado donde corresponde, en las urnas." *Yiyi Motors, Inc. v. E.L.A., et al.*, res. el 14 de octubre de 2009 (Martínez Torres, J., op. de conformidad, pág. 4).

Este reflujo, procedente de los pasados comicios electorales, sin duda, ha inundado al Tribunal. Ha sido esta marea la que repetidamente ha guiado el criterio de la mayoría de este Foro a la hora de rendir su juicio en casos trascendentales para este país. Hoy no es la excepción. Sin embargo, nuevamente expreso mi más férrea oposición a semejante metodología adjudicativa. Como bien apuntó el Juez Asociado Negrón García, "[e]n un foro colegiado —como lo es

este Tribunal— . . . es natural y saludable la pluralidad de juicios y enfoques. Por ende, **no tienen cabida criterios aprioristicos** basados en un reclamo de *solidaridad institucional*, y mucho menos la prevalencia de un mutismo individual sobre un asunto cardinal que directamente atañe a la eficiente administración de justicia: *la independencia judicial.*" *In re Reforma Judicial*, 136 D.P.R. 1, 43-44 (1994) (Negrón García, J., Voto Separado, *citando* Reflexiones en ocasión de la juramentación de jueces del Tribunal de Primera Instancia el 25 de enero de 1990) (Primer énfasis suplido).

El tiempo nos dirá si este vaivén judicial traerá consigo otras modificaciones ——tal vez para reducir el número de jueces del Tribunal—— a finales del año 2012, ante un resultado electoral desfavorable para ciertos sectores del país. Ello, aunque entonces se justifique con el "éxito" del aumento a nueve jueces, logrando disminuir la carga de trabajo y mejorar la eficiencia de la Institución, en realidad sería una forma burda de manipular nuestro Foro para impedir que la siguiente administración del gobierno pudiera ejercer sus facultades constitucionales de nominación y confirmación de jueces y de darle curso a su proyecto de país.[96]

---

[96] *Véanse*, Bruce Ackerman, *Anatomy of a Constitutional Coup*, London Review of Books, vol. 23, No. 3, 2001; Pedro Rivas Nieto, *El Golpe de Estado como forma de Intervención Política*, Shera Pública, Murcia, 2006, págs. 161-178; Curzio Malaparte, *Técnicas de golpe de Estado: Como los dictadores alcanzan el poder*, Editorial Planeta, Madrid, 2009.

No albergo duda de que el atentado que autoriza una simple mayoría de esta Curia representa un retroceso en la historia de nuestro sistema político-democrático. Sus motivaciones, arterías y repercusiones tendrán que ser juzgadas por la historia de este Pueblo. Mi conciencia está tranquila.

Hoy, un día que vivirá en la infamia,[97] comienza el medioevo puertorriqueño.

¡QUE LÁSTIMA!

Anabelle Rodríguez Rodriguez
Juez Asociada

---

[97] Franklin Delano Rosevelt, 8 de diciembre de 1941, Mensaje al Congreso de Estados Unidos.